Volume 1 of 2

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

VICTOR MENOTTI; THOMAS
SELLMAN; TODD STEDL; DOUG
SKOVE,
                     *Plaintiffs-Appellants,*

                v.

CITY OF SEATTLE; PAUL SCHELL,
Former Mayor of the City of
Seattle; NORMAN STAMPER, Former
Chief of Police of the City of
Seattle; SHARON STEVENS, a Seattle
Police Detective; RONALD SMITH, a
Seattle Police Officer,
                     *Defendants-Appellees.*

No. 02-35971

D.C. No.
CV-00-00372-BJR

KENNETH HANKIN; JENNIFER
HUDZIEC; STEPHANIE LANE; DENISE
COOPER; NICOLE PEARSON; on
behalf of themselves and all others
similarly situated;
                     *Plaintiffs-Appellants,*

                v.

CITY OF SEATTLE; PAUL SCHELL,
Former Mayor of the City of
Seattle; NORMAN STAMPER, Former
Chief of Police of the City of
Seattle,
                     *Defendants-Appellees.*

No. 02-36027

D.C. No.
CV-00-01672-BJR

OPINION

Appeal from the United States District Court
for the Western District of Washington
Barbara J. Rothstein, District Judge, Presiding

Argued and Submitted February 6, 2004
Submission Vacated February 17, 2004
Resubmitted April 14, 2004
Seattle, Washington

Filed June 2, 2005

Before: Ronald M. Gould, Richard A. Paez, Circuit Judges,
and Roslyn O. Silver,* District Judge.

Opinion by Judge Gould;
Partial Concurrence and Partial Dissent by Judge Paez

---

*The Honorable Roslyn O. Silver, United States District Judge for the
District of Arizona, sitting by designation.

**COUNSEL**

James E. Lobsenz, Carney Badley Spellman, P.S., and Aaron H. Caplan, American Civil Liberties Union of Washington, Seattle, Washington, for appellants Victor Menotti, Thomas Sellman, Todd Stedl, and Doug Skove.

Steve W. Berman, Hagens Berman LLP, Seattle, Washington, Arthur H. Bryant, Trial Lawyers for Public Justice, Oakland, California, and Michael E. Withey, Stritmatter Kessler Whelan Withey Coluccio, Seattle, Washington, for appellants Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Denise Cooper, and Nicole Pearson.

Ted Buck, Stafford Frey Cooper, P.C., Seattle, Washington, for the appellees.

## OPINION

GOULD, Circuit Judge:

In this case we search for the proper balance between, on the one hand, the vibrant rights of free speech and assembly in an open society and, on the other hand, the needs of a city to maintain order and security. We consider the constitutionality of an emergency order prohibiting access to portions of downtown Seattle, Washington, during the 1999 World Trade Organization (WTO) conference. Appellants filed lawsuits in the United States District Court for the Western District of Washington seeking damages for the constitutional rights that were alleged to be violated by the emergency order. Four of the Appellants also filed individual claims in which they alleged that their constitutional rights were infringed by Seattle police officers in the course of the conference. We determine that the emergency order was a constitutional time, place, and manner restriction on speech on its face, and we affirm the judgment of the district court on that issue. But we also determine that there are genuine issues of material fact whether the emergency order was constitutional as applied to certain Appellants, and we reverse and remand for trial on that issue. As for the Appellants' individual claims, we affirm in part, reverse in part, and remand.

## I

On October 2, 2000, Plaintiffs-Appellants Kenneth Hankin, Jennifer Hudziec, Stephanie Lane, Denise Cooper, and Nicole Pearson (the Hankin plaintiffs)[1] filed suit against the City of Seattle, then-Seattle Mayor Paul Schell, and then-Seattle Police Chief Norman Stamper in the United States District Court for the Western District of Washington, on behalf of a class defined as:

---

[1]Robert Hickey, Carroll Jackson, and Emily Maloney were also named plaintiffs in the lawsuit, but they are not parties to this appeal.

> All persons who were arrested by the City of Seattle
> and its police agents or its affiliated police agents on
> December 1 and 2, 1999, pursuant to the defendants'
> "no protest" policies and directives which were
> eventually embodied by the City of Seattle's Local
> Proclamation of Civil Emergency Order Number 3
> (and subsequent revisions) and who were subse-
> quently not convicted of any crime. Included in this
> class are all persons arrested pursuant to such poli-
> cies both inside and outside the zone established by
> Order Number 3.

The Hankin plaintiffs sought damages, alleging that defen-
dants violated their rights under the United States Constitu-
tion. The Hankin plaintiffs also requested declaratory relief
stating that the emergency order violated the United States
Constitution.

On March 7, 2000, Victor Menotti, Thomas Sellman, Todd
Stedl and Doug Skove (the Menotti plaintiffs) filed a lawsuit
against the City of Seattle, Schell, Stamper, and Officer
Michael Jennings and Detective Sharon Stevens of the Seattle
Police Department.[2] The Menotti plaintiffs filed an amended
complaint on January 9, 2002, adding Seattle Police Depart-
ment Officer Ronald Smith as a defendant. The Menotti plain-
tiffs alleged that defendants violated their rights under the
First, Fourth, and Fourteenth Amendments to the United
States Constitution and sought damages. Menotti and Sellman
also alleged that defendants committed false arrest.

The district court consolidated the two cases for the pur-
pose of resolving legal issues common to all parties. On Octo-
ber 29, 2001, the district court granted the defendants' motion
for partial summary judgment regarding the constitutionality

---

[2]Andrew Russell, Lauren Holloway, and Ronald Matyjas were also
plaintiffs in the lawsuit, but they are not part of this appeal. Officer Jen-
nings is also not part of this appeal.

of the emergency order, holding that as applied it was a constitutional time, place, and manner restriction on speech. The district court concluded that the emergency order: (1) was content neutral in that it did not exclude speech based on content or viewpoint, (2) was narrowly tailored because it "covered only enough territory for the WTO delegates and the President [of the United States] to move safely from their hotels to the convention [center] and lasted only during the conference," (3) served a significant government interest of maintaining order in an emergency situation, and (4) provided ample alternatives for expression because protestors could demonstrate just outside the boundaries of the restricted zone.

The district court denied the plaintiffs' cross-motion for summary judgment on the constitutionality of the emergency order as applied. The district court also granted the City's motion for summary judgment on the Hankin plaintiffs' claims under 42 U.S.C. § 1983 alleging a failure to train or supervise officers, holding that the Hankin plaintiffs had not presented any evidence supporting this contention.

On January 8, 2002, the district court denied the Hankin plaintiffs' motion for class certification. On August 29, 2002, the district court granted summary judgment to all defendants as to the Hankin plaintiffs' remaining claims, based on the district court's ruling of the constitutionality of the emergency order. The district court entered final judgment as to the Hankin plaintiffs pursuant to Fed. R. Civ. P. 54(b) on November 5, 2002.

As for the lawsuit filed by the Menotti plaintiffs, the district court on November 1, 2001, denied the Menotti plaintiffs' motion for partial summary judgment based on the alleged federal constitutional violations. On January 14, 2002, the district court, based on its ruling that the emergency order was constitutional, granted the defendants' motion for summary judgment as to Sellman's claims. However, the district court denied the defendants' motion for summary judgment as to

the claims of Skove and Stedl, finding that genuine issues of material fact existed as to the circumstances of their arrests.

On January 14, 2002, the district court also granted defendants' motion to dismiss the Menotti plaintiffs' claims against Schell and Stamper in their individual capacities, holding that the Menotti plaintiffs had not provided any evidence showing that Schell or Stamper were personally involved in the seizure or arrest of these plaintiffs.

On August 15, 2002, the district court granted Officer Smith's motion for summary judgment based on qualified immunity as to Skove's claims. The district court determined that Smith was entitled to qualified immunity on Skove's Fourth Amendment claim because Smith had acted reasonably, and further that Smith was entitled to qualified immunity on Skove's First Amendment claim because no constitutional violation had occurred. The district court denied Skove's cross-motion for summary judgment on the same claims.

Finally, on October 1, 2002, the district court granted summary judgment to the City on Menotti and Stedl's claims under 42 U.S.C. § 1983, holding that there was probable cause to arrest Menotti, and that Menotti and Stedl had submitted no evidence of a municipal policy or custom of illegally seizing or searching handbags. The district court entered final judgment as to the Menotti plaintiffs on October 1, 2002.

The Menotti plaintiffs filed a timely notice of appeal on October 23, 2002. The Hankin plaintiffs filed a timely notice of appeal on November 13, 2002. We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand.

## II

In reviewing de novo the district court's grant of summary judgment, where the facts are disputed we view the evidence

in the light most favorable to the non-moving party. *United States v. City of Tacoma*, 332 F.3d 574, 578 (9th Cir. 2003). We determine whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. We do not weigh the evidence or determine the truth of disputed material facts, but determine only whether there is a genuine issue for trial. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc).

The WTO is an international group comprised of member nations that discuss trade issues and enter into trade agreements.[3] In January 1999, the White House announced that the City of Seattle, Washington (the City) had been selected as the location for the first WTO conference to be held in the United States. The conference was to take place from November 30, 1999 to December 3, 1999. Representatives from the 134 WTO-member nations,[4] including the President of the United States, were to convene in Seattle.

Those who opposed the WTO's agenda and specific activities convened in Seattle well in advance of the opening of the conference, and protest activity began taking place. Three weeks before the opening of the conference, unknown individuals broke windows at a Gap clothing store in downtown

---

[3]The WTO was established on January 1, 1995, during the Uruguay Round negotiations held pursuant to the General Agreement on Tariffs and Trade. According to its web site, the WTO "is the only global international organization dealing with the rules of trade between nations. At its heart are the WTO agreements, negotiated and signed by the bulk of the world's trading nations and ratified in their parliaments. The goal is to help producers of goods and services, exporters, and importers conduct their business." What is the WTO?, *at* http://www.wto.org/english/thewto_e/whatis_e/whatis_e.htm (last visited Oct. 7, 2004). The WTO's objectives have generated a vigorous opposition by those who believe that the WTO "favor[s] trade expansion over all else." Lynda Gorov, *The Varied Foes of WTO Unite in Seattle Protests*, Boston Globe, Nov. 30, 1999, at A1.

[4]As of the filing date of this Opinion, the WTO has 148 member nations.

Seattle and threw several "Molotov cocktails"[5] into the building, causing substantial damage. The "anarchist"[6] symbol was spray-painted onto the walls of the Gap store and on the adjoining sidewalk. Other protestors attempted to gain entry into downtown Seattle offices of timber and forest product companies. Protestors trespassed onto downtown Seattle's Old Navy store, and hung a huge protest banner on the face of the storefront. On November 26, 1999, the day after Thanksgiving, a group of fifty to sixty protestors entered a parade without permission to protest the WTO.

Protest activity began to intensify on November 29, 1999, one day ahead of the WTO conference. While most protestors were peaceful, others were violent. The level of violence cannot be considered de minimis and in some cases posed threats to persons.[7] Some protestors vandalized property by spray

---

[5]A "Molotov cocktail" is an explosive device consisting of "a bottle, gasoline, and a rag." *United States v. Simmons*, 83 F.3d 686, 687 (4th Cir. 1996).

[6]"The anarchist movement represents a range of groups, from organized and primarily nonviolent groups like the Industrial Workers of the World to loosely knit and more extremist splinter groups . . . ." Ruth Teichroeb, *Fringe Anarchists in Middle of Violent Demonstrations*, Seattle Post-Intelligencer, Dec. 1, 1999, at A15. The "anarchist" symbol consists of the letter "A" in a circle, and the symbol "is one of the most familiar symbols of anarchism and represents the slogan 'Anarchy Is Order.' " *Id.*

[7]The dissent, while acknowledging that violence occurred, argues that our "account exaggerates its pervasiveness" because most protestors were peaceful. Dissent at 6027. We of course explicitly recognize that "most protestors were peaceful," but this does not negate the harsh reality and striking import of the widespread violence instigated by those protestors who were not peaceful. Moreover, the description of the WTO riots that follows is not just that of the majority. The whole world witnessed the rampant violence and chaos in the streets of Seattle at the outset of the WTO meeting. The dissent's account misapprehends reality by minimizing the violence and its import. Any fair and objective review of the record would lead to the conclusion that District Judge Barbara J. Rothstein's order granting summary judgment to the City correctly described an emergency situation marked by pervasive vandalism, theft, arson, and assault

painting buildings and breaking windows. Others pounded on windows of downtown stores and threw rocks at police officers. Police formed a security perimeter around the Niketown store in downtown Seattle because of protestors encouraging a crowd to take over the store. Damage to property and risks to individuals on this day were not insignificant, though limited in geographic area to a few blocks in the center of the City, and protestors dispersed late into the evening.[8]

The WTO conference opened formally on November 30, 1999, and from law enforcement's perspective, things got worse. Police logs indicate that demonstrators gathered in the downtown area as early as 5:45 a.m. At least some among the protestors had violent intentions. On a videotape introduced as part of the record, a masked protestor says, "50,000 people that really care . . . . I'm hoping that we can come out here, and get crazy and fucking up shit . . . , that every city in the world knows that it can't host the WTO conference and it better give control of the city back to the people or that city's going to be torn to pieces."

Those protestors who chose to use violence to disrupt the WTO's conference used an array of weapons, devices, and tactics to obstruct the conference. The disruption of normal

---

that overwhelmed law enforcement resources. These acts of violence are undisputed in the record before us. One may disagree on the legal implications of the violence under First Amendment doctrine, and doubtless we and the dissent do so disagree. But to minimize the violence and threat to the City, to visiting foreign dignitaries, and to Seattle's citizens, as our dissenting colleague does, is wrong.

[8]Appellants have not alleged a negligence cause of action against the City for having advance notice of but failing to prevent the chaos that stemmed from the violence that marred the WTO conference. However, the pattern of protest propagating civil disorder and violence is relevant to understanding the City's interest in restoring and maintaining order to allow the WTO conference to proceed securely. Our dissenting colleague fails to give this interest adequate heed.

city life was so extreme in some locations that it bordered on chaos. Police officers in contemporaneous reports said that they saw protestors carrying bottles filled with flammable liquids, locking down intersections by forming human chains from lightpost to lightpost, breaking windows at retail stores,[9] overrunning and looting small retail stores, and jumping on cars. By 8:00 a.m., protestors had cut off vehicular access to the Paramount Theater and the Washington State Convention & Trade Center, the primary meeting venues of the conference. After demonstrators were discovered inside meeting venues, police requested and received a "lock down"[10] of the Washington State Convention & Trade Center and the Sheraton Hotel, where many WTO delegates were staying.[11] Seattle Police Department, *The Seattle Police Department After Action Report, World Trade Organization Ministerial Conference*, Apr. 4, 2000, at 36-39 [hereinafter "*WTO After Action Report*"].

Some protestors directed violence at law enforcement authorities: Among the violent, there were protestors who assaulted police officers with chemical irritants, and others who vandalized police cars. Some violent protestors threw metal spikes, cans, bottles, signs, empty gas canisters, and pieces of concrete at officers, who were forced to wear riot gear for protection. Other protestors deliberately disregarded police lines and attempted to break through in violent confrontations with police. According to a report of the Seattle City Council prepared after the WTO convention, "officers

---

[9]Niketown, the site of protest on the prior day, again attracted the attention of violent protestors. Officers received reports that Niketown was being ransacked by protestors, and the officers had to rescue employees through a rear alley door.

[10]A "lock down" of these facilities meant that no persons could enter or exit.

[11]The increased level of protection for delegates was necessary for their security. It also was even more important because WTO meeting venues had been designated the equivalents of foreign embassies, mandating heightened security protection.

were put in perilous situations where, often cut off from communication, they were expected to endure physical assaults and taunts for long periods without food, rest, restrooms, or water." Seattle City Council, *Report of the WTO Accountability Review Committee*, Sept. 14, 2000, at 5 [hereinafter "*ARC Report*"]. Some officers were "violently barraged with ball bearings ('pachinko' balls), rocks and bottles, [and] squirted with urine." *Id.* at 10 & n.14. One police officer on duty suffered a heart attack, and a helicopter evacuation was required because medical units could not break through the gathered crowd to provide medical assistance.

Some officers did not take the passive resistance approach in response to being targeted by violence, and mutual insecurity among police and protestors caused the situation to spiral out of control. In lieu of large-scale arrests, some officers responded with tear gas and similar non-lethal weapons like pepper gas, beanbag guns, and rubber bullets. *Id.* at 4. The gravity of the situation caused some officers to resort to measures characterized later by the City Council as "out of proportion to the threats faced," provoking further disturbance and resistance from violent protestors.[12] *Id.* at 4, 11.

---

[12]The dissent focuses on the Seattle Police Department for its response, finding significance in the City Council's remark that officers "likely intensified the situation." Dissent at 6028. The dissent's characterization is incorrect as a description of police conduct as a whole, and in any event is irrelevant to the analysis of Order No. 3's constitutionality. The City Council's *ARC Report* acknowledges that "police officers on the front lines had no basis for confidence that the violence would stop with rocks and bottles," and the report "thankfully endorses the performance of those officers who underwent unnecessary hardship and were the victims of poor planning and leadership in the field." *ARC Report* at 4, 10. Moreover, whether Order No. 3 comports with the First Amendment does not turn on who is to blame for the intensity of the situation that the City faced. *See* discussion *infra* Part III. Whatever the complex of causes, the City was faced with riots and disorder beyond its control that threatened the safety of visiting foreign officials, prompting Order No. 3, and its permissibility must be assessed in light of the crisis facing the City when it was adopted. Finally, it is also likely that most of the time when police attempt to quiet a violent disturbance the situation is intensified, which is a collateral consequence of law enforcement's response to violent protest.

The general public was also at risk. Some violent protestors started fires in the streets and in large dumpsters, and then protestors prevented fire trucks from entering the area. A driver of a garbage truck was pulled from his vehicle and assaulted in the core downtown area. Once police were overwhelmed, some uses of non-lethal weapons, such as chemical irritants, failed to discern law-abiding demonstrators and bystanders from the law-breakers they were intended to disperse. Not only dignitaries from many nations worldwide with interest in the WTO's trade conference, but also, regrettably, panic, confusion, and chaos were visiting Seattle.

Some protestors even directly interfered with WTO delegates in an effort to disrupt the progress of the conference. Some violent protestors held, pushed, or tackled WTO delegates to prevent their entry into conference venues. Some WTO delegates were forcibly prevented from leaving conference venues. Some violent protestors stopped one delegate's car and punctured its tires. Reflecting the extreme dangers to delegates, protestors, and the public, at least one WTO delegate drew a gun in response to the protestors' attempts to detain him, requiring immediate police intervention.

Some violent protestors were well-organized, and their actions were coordinated. Some protestors gathered intelligence about police operations during the protest by asking officers questions about law enforcement tactics. Other protestors listened in on squad briefings taking place on city streets. Still others used cellular telephones and "walkie-talkies" to coordinate protestors' activities.[13] By one account, Seattle's streets turned into "seeming war zones." *ARC Report* at 4. It is perplexing how our dissenting colleague can rely on the City Council's report, with its acknowledgment of the "war zone" atmosphere in Seattle, and still urge the violence

---

[13]On the previous day, a protestor on a bicycle rode ahead of a group of protestors, communicating to the crowd via radio the locations of police officers.

was not pervasive; although the *ARC Report* suggests that violent protestors were less than one percent of the total protestors, this is not a small amount of violence given the activities in which the protestors engaged, and where there were tens of thousands of protestors.

Despite the gravity of these problems, not all protest was violent or disruptive. Much protest activity was ordered and reasonable. Several marches involving primarily peaceful protestors took place in the downtown area on November 30, 1999. These marches, comprised of concerned persons who were not violent and who were not breaking the law, caused the inflow of tens of thousands of persons into downtown Seattle. The largest protest of the day, a march organized by the AFL-CIO, was estimated by police to have involved 40,000 persons. Other protest marches involving significant numbers of persons included a march of about 1000 members of the Sierra Club, a march of 500 students from the University of Washington, and a march of 1000 protestors from the Tibetan Rights Association. These marches by non-violent protestors showed the substantial public sentiment opposing the WTO or its activities. Protests such as these are the positive fruits of an open society, and encourage us to scrutinize with care the constitutional issues raised by city and police responses to the breakdown of civic order and security caused by violent protestors seeking to disrupt the WTO conference.[14]

As noted by the Seattle Police Department's *WTO After Action Report*, these largely peaceful demonstrations took place amid the chaos and disruption caused by the violent

---

[14]The dissent's characterization of the decision to enact Order No. 3 as following the realization that the "crowd was simply larger than the police had anticipated" again ignores the violence and riot that threatened the WTO conference. It misapprehends the extent of disorder and insecurity caused by the large crowd: The police "were not going to be able to bring the situation under control without taking some sort of drastic action," and "the only recourse" they had was to "establish the police perimeter" to "provide security for the delegates." *See* Dissent at 6026.

protestors. The report also specified that the combination of heightened security measures required for WTO delegates and the large number of protestors rendered police unable effectively to make individual arrests of those protestors who were breaking the law. The report stated:

> This was a pattern that occurred throughout the conference and presented significant tactical challenges to police commanders. The protestors were establishing a fluid, dynamic method of operation that consisted of rapid deployment and the use of non-criminal protestors to buffer smaller pockets of protestors engaging in significant criminal acts.

*WTO After Action Report* at 35. One Seattle police captain's report noted that officers "heard and saw numerous incidents of property destruction, burglary, and looting; but we were unable to leave our lines to take enforcement actions."

At about 3:30 p.m. on November 30, 1999, then-Seattle Mayor Paul Schell declared a civil emergency in the City of Seattle, pursuant to Seattle Municipal Code Section 10.02. The Mayor also imposed a general curfew. The governor of the State of Washington then authorized the deployment of, and called out, the National Guard.[15]

President Clinton arrived at the Westin Hotel in downtown Seattle between 1:30 a.m. and 2:30 a.m. on December 1, 1999. A few hours after the President's arrival, when protest activity had temporarily subsided, Mayor Schell signed "Local Proclamation of Civil Emergency Order Number 3" (Order No. 3). Order No. 3 said, in pertinent part:

---

[15]The dissent chastises the City for poor planning driven by political and cost considerations. Dissent at 6029. This condemnation does not control whether Order No. 3 comports with the First Amendment. Our analysis properly focuses on the City's chosen means to restore order once lost to violent protestors bent on preventing the WTO conference from proceeding. *See* discussion *infra* Part III.A.2.

WHEREAS, the Mayor declared a civil emergency exists in the City of Seattle ("the City") in the Proclamation Dated November 30, 1999; and

WHEREAS, after the issuance of the Proclamation and despite the deployment of hundreds of law enforcement officers, the City continued to experience civil disturbances resulting in injury to persons and damage to property; and

WHEREAS, the level of city disturbances and danger to persons and property has been highest in those areas in which there are protests in the vicinity of World Trade Organization ("WTO") meetings; and

WHEREAS, the City understands its obligations to permit expressive activity pursuant to reasonable time, place and manner restrictions necessitated by the existing public safety concerns for WTO delegates, dignitaries, citizens, public safety employees and protestors; and

WHEREAS, the Chief of Police and other public safety officials have determined that the safety of WTO delegates, dignitaries, citizens, public safety employees and protestors cannot be preserved without reasonably limiting access to areas used by WTO personnel; and

WHEREAS, it is imminently necessary to use extraordinary measures to protect the public peace, safety and welfare; and

WHEREAS, the civil emergency necessitates the utilization of emergency powers granted to the Mayor pursuant to Seattle Municipal Code, Chapter 10.02 and [Wash. Rev. Code] Chapter 38.52. Therefore . . . .

A limited curfew is imposed in the portion of the City within the following boundaries: Starting on the corner of 4th Avenue and Lenora Street, then proceeding south on 4th Avenue to Seneca Street, then east on Seneca Street to the I-5 freeway, then north along the I-5 freeway to Boren Avenue, then north on Boren Avenue to Pine Street, then west on Pine Street to 6th Avenue, then north on 6th Avenue to Lenora Street, then west on Lenora Street to, and concluding at 4th Avenue and Lenora, as shown on the attached map.

The effect of Order No. 3 was that all persons, subject to limited exceptions, were prohibited from entering the portion of downtown Seattle described in the order. The exceptions to the prohibition on entering the restricted zone were granted for: (1) delegates and personnel authorized by the WTO to participate in official WTO functions; (2) employees and owners of businesses within the restricted area and other personnel necessary to the operation of those businesses; and (3) emergency and public safety personnel.[16] Violations of Order No. 3 were punishable by a fine of not more than $500 and/or imprisonment of not more than 180 days. At all times, the Washington State Convention & Trade Center and the Paramount Theater were within the restricted zone, as well as the major hotels where WTO delegates were staying (i.e., the Four Seasons Hotel, Cavanaughs, and the Sheraton Hotel). The restricted zone skirted these venues, and in substance provided a protective perimeter.[17]

In the early morning hours of December 1, 1999, Seattle Assistant Chief of Police Harv Ferguson issued an "Opera-

---

[16]In an amendment to Order No. 3 issued later that day, additional exemptions were granted for city staff and credentialed members of the press.

[17]We attach as Appendix A a diagram of the boundaries of the restricted zone that was part of the record in this case.

tions Order" to implement Order No. 3 and the restricted zone. The Operations Order told officers that "[v]ehicles and/ or pedestrians . . . are authorized access inside the [restricted zone] if they have a reasonable purpose for entering the perimeter. A reasonable purpose includes work, shopping at a specific location within the [restricted zone], or other like type reasonable activity." Thus, as it was interpreted, Order No. 3 excluded all persons except delegates and personnel authorized by the WTO for its official functions, employees and owners of businesses within the restricted area, their customers, other personnel necessary to the operation of those businesses, and emergency and public safety personnel. Initially, Order No. 3 had not explicitly permitted shoppers to enter, but it had allowed business owners and persons necessary to run their businesses to enter, which implicitly supported the interpretation of the Operations Order.

At a press conference on the morning of December 1, 1999, Assistant Seattle Police Chief Edward Joiner[18] explained the City's adoption of Order No. 3:

> We're going to adopt a policy that's pretty much in line with what's done in other cities around the world when they have an event of this magnitude, and that is, to take the core area where the [WTO] conference is occurring . . . and prohibit any demonstrations within that core area for the remainder of the week.

Seattle Police Captain James Pugel testified in deposition[19] that Assistant Chief Joiner had instructed him, in connection

---

[18]Chief Stamper had delegated to Assistant Chief Joiner the task of planning the Seattle Police Department's response to the WTO conference.

[19]The Menotti plaintiffs submitted Captain Pugel's deposition testimony in support of their motion for partial summary judgment and in opposition to the City's motion for partial summary judgment.

with the implementation of Order No. 3 and the Operations Order, "[n]o large protests. No people can come marching through [the restricted zone]. There will be no marches."

Chief Stamper testified in deposition[20] that the effect of the Operations Order was to exclude protestors from entering the restricted zone:

> From the officer's point of view, we have made it clear that we could not permit large groups to gather to block intersections and so forth, and from their point of view what they're thinking and what they believe is their direction is to make sure that nobody comes into that, into the so-called no-protest zone unless he or she is there to shop or has legitimate business purpose in the downtown area, so from their point of view it effectively meant anybody coming in to protest.

Order No. 3 and the accompanying Operations Order decreased violence and protest within the restricted zone. But it did not stop either violence or protest within the restricted zone. Inside the restricted zone, protestors gathered in open defiance of Order No. 3, and police made about 300 arrests.[21]

President Clinton addressed the WTO conference on December 1, 1999, and departed the next morning. There was no violence immediately incident to his presentation. On

---

[20]The Menotti plaintiffs submitted Chief Stamper's deposition testimony in support of their motion for partial summary judgment and in opposition to the City's motion for partial summary judgment.

[21]Even outside the restricted zone, there were some problems of violence incidental to protest. Some violent protestors caused property damage, threw debris, blocked the street, and trapped people in their cars. Some protestors jumped onto an officer's patrol car and shook it by its light bar, while others laid in front of the car and prevented the officer from escaping. Some protestors took over the fuel pumps at a gas station and attempted to fill small bottles with gasoline.

December 2, 1999, Mayor Schell amended Order No. 3 by reducing the size of the restricted zone. As modified, the restricted zone was reduced to exclude the Westin Hotel because President Clinton had since departed.[22] Police logs indicate that protest violence decreased on December 2, 1999, and through the conclusion of the WTO conference on December 3, 1999. Order No. 3 expired at 7:00 a.m. on the morning of December 4, 1999.

In opposition to the City's motion for summary judgment, plaintiff-appellant Kenneth Hankin submitted a declaration stating that he was arrested for violating Order No. 3 by trespassing inside the restricted zone with the purpose of protest. Hankin testified via declaration that, on the morning of December 1, 1999, he and others participated in a group protest that began in Denny Park, north of downtown Seattle and outside the restricted zone. As their group approached Westlake Park, a downtown shopping plaza and public square within the restricted zone, Seattle police surrounded them. The group responded by sitting on the ground. Hankin testified that, without warning, Seattle police arrested the group of protestors, and then turned to another portion of Westlake Park, where Hankin was standing. Hankin and others beside him were arrested.

Victor Menotti submitted his deposition testimony in support of his motion for partial summary judgment.[23] Menotti testified that he was a credentialed participant in the WTO conference and that, on December 1, 1999, he was standing

---

[22]We attach as Appendix B a diagram of the revised boundaries of the restricted zone that was part of the record in this case.

[23]We consider these depositions because they were part of the record when the district court granted summary judgment to the defendants on the Menotti plaintiffs' claims. Fed. R. Civ. P. 56(c) (stating that summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law").

on a sidewalk talking with a small group about a WTO conference meeting he had just attended. Without warning, police charged the group surrounding Menotti. Menotti ran, believing that police were trying to disperse the crowd, but stopped when he realized he was being pursued. Menotti was arrested for pedestrian interference and obstructing an officer; however, the charges against Menotti were dismissed before a probable cause hearing was held.

Thomas Sellman also introduced his deposition testimony and that of Seattle Police Detective Sharon Stevens in support of his motion for partial summary judgment. Sellman testified that he was within the restricted zone on December 1, 1999, distributing leaflets containing a cartoon criticizing the WTO. Stevens testified that she and another officer witnessed Sellman distributing the flyers and asked Sellman what business he had in the zone. When Stevens ascertained that Sellman did not come within one of the exceptions to Order No. 3, Stevens ordered him to leave the restricted zone. When Sellman attempted to hand out another flyer, Stevens placed him under arrest for failing to disperse. Sellman spent two nights in jail and was released thereafter.

Todd Stedl presented deposition testimony in support of his motion for partial summary judgment. Stedl testified that, after hearing about Order No. 3 on December 1, 1999, he decided to enter the restricted zone and distribute leaflets containing the text of the First Amendment. While standing just outside the zone, Stedl tried to hand a leaflet to an officer, who reacted by grabbing the fliers and searching Stedl's bag. When Stedl complained that the officer could not seize his fliers or search his bag without a warrant, the officer told him to contact City Hall and to leave the restricted zone. Stedl asked for the officer's badge number, and the officer told Stedl to leave. The officer later approached Stedl again and told him to leave the area. Stedl told the officer that he thought he already was outside the zone. The officer replied that Stedl should get going. When Stedl asked how far, the

officer told him fifteen blocks. Stedl testified that he was too intimidated to return to the zone to pass out more leaflets, and felt that if he had returned, he would be arrested. The officer was never identified.

Doug Skove introduced his deposition testimony and video evidence in support of his motion for partial summary judgment. Skove testified that, on December 2, 1999, he decided to go to Seattle after hearing about the restricted zone. He carried a sign that read on one side, "Is the WTO in control of Seattle too?" and on the other side "I have the right to protest non-violently." The video evidence shows that a police officer (later identified as Seattle Police Officer Ronald Smith) saw Skove carrying the sign as Skove walked into a crosswalk. Smith said to Skove, "Hey, what did the Mayor tell you? Other side of Fourth, other side of Seneca."[24] As Skove finished crossing the street, Smith approached, grabbed Skove's sign and pulled it away from his hands. Skove turned to his right and continued walking across the street and away from Smith, while Smith shouted "Come here, hey pal!" Skove continued walking away. Smith said, "That's alright, that's okay," as Smith walked away, folded Skove's sign, and threw it away. After Skove had another encounter with police where a second sign was seized, Skove was warned he would be arrested if he continued protesting. Skove left the restricted zone.

## III

The Hankin and Menotti plaintiffs contend that Order No. 3 was an unconstitutional time, place, and manner restriction on its face, and the Menotti plaintiffs also contend that Order No. 3 unconstitutionally conferred unfettered police discretion for its implementation. The Hankin plaintiffs also contend that Order No. 3 was unconstitutional as applied to them

---

[24]This was an instruction from Smith to Skove to exit the confines of the restricted zone.

because the City had adopted a policy of arresting only anti-WTO protestors within the restricted zone.[25]

## A

We first address the facial constitutionality of Order No. 3. We have held that "[a]n ordinance is facially unconstitutional if (1) it is unconstitutional in every conceivable application because it is vague or impermissibly restricts a protected activity or (2) it seeks to prohibit such a broad range of protected conduct that it is unconstitutionally overbroad." *Vlasak v. Superior Court*, 329 F.3d 683, 688 (9th Cir. 2003) (internal quotation marks and citation omitted). The Supreme Court has held that "particularly where conduct and not merely speech is involved, we believe that the overbreadth of a statute must not only be real, but substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973). The Hankin plaintiffs contend that Order No. 3 was facially unconstitutional because it was overbroad. In evaluating this overbreadth challenge, we determine whether Order No. 3's restrictions on speech were content neutral, were narrowly tailored to serve a significant governmental interest, and left open ample alternative means of communication. *Vlasak*, 329 F.3d at 689; *see also Frisby v. Shultz*, 487 U.S. 474, 481 (1988).

## 1

[1] We address first whether Order No. 3 was content neutral. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases

---

[25]"A facial challenge alleges that any enforcement of the ordinance creates an unacceptable risk of the suppression of ideas. An as-applied challenge alleges that the restriction on speech is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Kuba v. 1-A Agric. Ass'n*, 387 F.3d 850, 856 (9th Cir. 2004) (internal quotation marks and citation omitted).

in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). The reason for this rule is to protect and preserve free and unfettered speech for the ultimate good of society. We have expressed this basic reason in varied ways, but it is unassailable that the "fundamental principle" behind content analysis is that "government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48-49 (1986) (internal quotation marks and citation omitted). In assessing whether a restraint on speech is content neutral, we do not make a searching inquiry of hidden motive; rather, we look at the literal command of the restraint. Stated another way, we agree with Justice Kennedy's observation in *City of Los Angeles v. Alameda Books, Inc.*, that "whether a statute is content neutral or content based is something that can be determined on the face of it; if the statute describes speech by content then it is content based." 535 U.S. 425, 448 (2002) (Kennedy, J., concurring). Our circuit has adopted this view. *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153, 1164 (9th Cir. 2003).

**[2]** Applying these principles here, we see Order No. 3 as content neutral on its face. Even when we credit plaintiffs' evidence and give plaintiffs all reasonable inferences, the text of Order No. 3 is not in dispute, and it does not favor one content over another. The purpose of enacting Order No. 3 had everything to do with the need to restore and maintain civic order, and nothing to do with the content of Appellants' message. *See United States v. Griefen*, 200 F.3d 1256, 1260 (9th Cir. 2000) ("[A] restriction on expressive activity is content-neutral if it is justified, i.e., based on a non-pretextual reason divorced from the content of the message attempted to be conveyed."). As a matter of law, Order No. 3 was not a regulation of speech content, but rather was "a regulation of the places where some speech may occur." *See Hill v. Colorado*, 530

U.S. 703, 719 (2000). Under Order No. 3, persons could not protest—in support of or against—*any* topic within the restricted zone. *Id.* (holding that restrictions are not content based where they "apply equally to all demonstrators, regardless of viewpoint, and the statutory language makes no reference to the content of the speech") (internal quotation marks and citation omitted). The restricted zone established by Order No. 3 applied equally to persons of all viewpoints. That Order No. 3 predominantly affected protestors with anti-WTO views did not render it content based. *See Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 (1994) ("[T]he fact that the injunction covered people with a particular viewpoint does not itself render the injunction content or viewpoint based.").

Further, the City's evidence in testimony of Mayor Schell,[26] Police Chief Stamper,[27] and Assistant Chief Joiner[28] was that the City did not implement Order No. 3 because of disagreement with the message of anti-WTO protestors. Instead, the motivating factor in the adoption of Order No. 3, as stated in

---

[26]Schell testified in deposition that a "secure zone" was his "primary objective" in enacting Order No. 3, and that the advice he received from his staff was that a "secure zone" was necessary in order to assure the safety of downtown residents and WTO delegates.

[27]Stamper testified in deposition that a paramount goal was maintaining security and avoiding violence. He testified, "I also need to emphasize that we had a crucial intersection blocked completely denying access of emergency vehicles and denying access to the WTO venue itself . . . . [T]hose were formidable challenges bigger by far than anything, once again, that I had seen in the six years I had been here . . . . [O]ur concern is the violence could erupt on either side, that a delegate, for example, angered at being denied access could actually resort to violence, in this case, possibly armed violence."

[28]Joiner testified in deposition that "the only recourse we had was to establish the [restricted zone] where we could provide security for the delegates and so forth." Joiner also testified that "[w]e would not have allowed [peaceful protesters] to stay [within the restricted zone] under the circumstances because we couldn't - we could not be assured that the demonstration would remain peaceful given the experience that we already had."

its text, was the City's observation that "the level of civil disturbances and danger to persons and property ha[d] been highest in those areas in which there [were] protests in the vicinity of [WTO] meetings," and the need to ensure the safety of WTO delegates as well as downtown residents and workers. The plaintiffs did not submit evidence controverting the text of Order No. 3, which is not in dispute, or contradicting the purposes recited by the Mayor and police chief.[29]

Appellants contend that Order No. 3 was content based because it permitted exemptions for shoppers and downtown workers to enter the restricted zone. We reject this argument because these exemptions did not enable the City to discriminate against ideas it disfavored. *See One World One Family Now v. City and County of Honolulu*, 76 F.3d 1009, 1012 n.5 (9th Cir. 1996) ("Because these exemptions don't enable the city to discriminate against ideas it disfavors, they don't render the ordinance content-based."). The exemptions permitted shoppers and downtown workers to go about their business in the restricted zone and did not enable the City to discriminate against any persons on the basis of their views. Further, there is no evidence that those persons who were permitted to enter the restricted zone were part of the security problem that prompted the adoption of Order No. 3. *See Hill*, 530 U.S. at 723 ("[A] statute that restricts certain categories of speech only lends itself to invidious use if there is a significant number of communications, raising the same problem that the stat-

---

[29]Appellants submitted the deposition testimony of Schell and Stamper in an attempt to establish that the City's purpose in adopting Order No. 3 was unlawful, in that the City implemented Order No. 3 with the purpose of eliminating protestors from the downtown area. But this evidence is consistent with the objective of Order No. 3 to eliminate all persons, with limited exceptions, from the downtown area. Even if plaintiffs could establish that the City had an illicit motive in adopting Order No. 3, that would not be dispositive. The Supreme Court has held unequivocally that it "will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968).

ute was enacted to solve, that fall outside the statute's scope, while others fall inside.").

**[3]** We hold that Order No. 3 was content neutral, and proceed to address the other factors necessary for a reasonable time, place, and manner restriction.[30]

## 2

**[4]** We next assess whether Order No. 3 was narrowly tailored to serve a significant governmental interest. The Supreme Court has held that "[a] statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485. To be narrowly tailored, a statute "need not be the least restrictive means of furthering [the government's] interests, but the restriction may not burden substantially more speech than necessary to further the interests." *United States v. Baugh*, 187 F.3d 1037, 1043 (9th Cir. 1999). However, "the First Amendment demands that municipalities provide 'tangible evidence' that speech-restrictive regulations are 'necessary' to advance the proffered interest in public safety." *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 863 (9th Cir. 2001). The tailoring of the restraint must of course correspond to the purposes it serves. *Ward*, 491 U.S. at 799 (holding that the narrowly tailored requirement is satisfied "so long as the [neutral] regulation promotes a substantial government interest that would be achieved less effectively absent the regula-

---

[30]We also hold that Order No. 3 was not "viewpoint-based" on its face. Viewpoint discrimination occurs "when the government prohibits speech by particular speakers, thereby suppressing a particular view about a subject." *Giebel v. Sylvester*, 244 F.3d 1182, 1188 (9th Cir. 2001) (internal quotation marks and citation omitted). Here, Order No. 3's ban on protests did not prohibit a particular viewpoint, and applied equally to persons who wished to protest about any topic. As in *Hill*, Order No. 3 "applie[d] equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries." 530 U.S. at 723.

tion") (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).[31]

[5] Applying the rule of *Ward* and its standard here, we return to the issue of whether Order No. 3 was narrowly tailored to serve a significant government interest. No one could seriously dispute that the government has a significant interest in maintaining public order; indeed this is a core duty that the government owes its citizens.[32] The Supreme Court has declared that "[i]t is a traditional exercise of the States' police powers to protect the health and safety of their citizens." *Hill*, 530 U.S. at 715 (internal quotation marks and citation omitted); *see also Edwards*, 262 F.3d at 863; *One World One Family Now*, 76 F.3d at 1013. In the face of violent riot, the City had a duty to restore order and to ensure the safety of WTO delegates and the residents of Seattle.[33] The City also

---

[31]While the City was not required to choose the least restrictive alternative, an assessment of alternatives can still bear on the reasonableness of the tailoring of Order No. 3 and whether it was "narrowly tailored" as required. We have said that "if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the 'fit' between ends and means is reasonable." *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993); *Edwards*, 262 F.3d at 865.

[32]The district court was not required to accept the conclusion of Appellants' declarant that the City's only interest was to "transport the delegates to the conference." That was not an accurate summary of the record before the district court. Nor in our analysis were we required to pretend as if the movement of delegates was the City's only interest in the face of riot. The record before the district court showed widespread violence and the breakdown of civic order. On the undisputed facts before the district court, the City's interest in maintaining peace and order is fairly presented. The dissent's attempt to reduce the City's interest to transporting delegates is wrong. Our analysis properly focuses on the City's interest when it enacted Order No. 3: restoring order and providing security to the core downtown area to protect the President, visiting world dignitaries, and the general public, and to allow the WTO conference to proceed.

[33]The dissent argues that our account of the breakdown in public order "does not paint a clear picture of the situation confronting City officials"

had an interest in seeing that the WTO delegates had the opportunity to conduct their business at the chosen venue for the conference; a city that failed to achieve this interest would not soon have the chance to host another important international meeting.[34]

The Appellants nonetheless contend that the safety net cast

_____

because the protestors had left the core downtown area and the violence had subsided when Order No. 3 was implemented. Dissent at 6027. But there is no logical connection between an assessment of the violence that occurred when WTO proceedings were ongoing and a temporary cessation of violence after WTO proceedings had concluded for the day. Even a fierce battle may experience a respite of calm, and the calm of an evening can precede a storm in the morning. The City was well aware that some protestors wanted to shut down the WTO conference by violent means and that the WTO conference was to resume the following day, and so there was a strong likelihood that more "organized violence of a serious nature [was] about to occur." *See Collins v. Jordan*, 110 F.3d at 1363, 1373 (1997).

In any event, the dissent's claim, based on a single "sweep of the streets" at 8:00 p.m., that the streets of Seattle were "calm and under control" during the evening of November 30, Dissent at 6027, ignores the undisputed evidence. By 9:00 p.m., officers were in danger of being assaulted and injured by some aggressive protestors who held the advantage of Capitol Hill's higher ground. Ongoing skirmishes continued until 3:30 a.m., with officers fending off "rocks, bottles, golf balls, and . . . incendiary devices." *WTO After Action Report* at 42. Moreover, violent protestors had established a pattern of converging, protesting, and then dispersing only to reassemble later at another location. *Id.* at 35. Given the violent protestors' aim to shut down the WTO conference and their pattern of conduct, a realistic depiction of events in the record is that the violence had "temporarily subsided" during the evening of November 30, not that the violence had "ended," as the dissent maintains. Even crediting Appellants' evidence and giving all reasonable inferences to the Appellants, as we must under the summary judgment standard, the record does not permit a rational conclusion that the City should have thought the violence "ended."

[34]This interest is embraced within the City's asserted interest in restoring order and maintaining security, which are necessary for public safety, effective commerce, and the vitality of the City.

by the City was too broad, and that it restricted protest unduly in too large of an area, and thus wasn't narrowly tailored.[35] We turn to these contentions.

[6] Here, the City had a tough problem. Violent protestors were damaging the City and jeopardizing the progress of the WTO conference. Yet violent protestors were breaking the law amidst throngs of lawful protestors. In this setting, per evidence that is not materially in dispute, large numbers of non-violent protestors prevented police from curbing effectively the activities of the violent protestors.[36] Police reports said that "[t]he protestors were establishing a fluid, dynamic method of operation that consisted of rapid deployment and the use of non-criminal protestors to buffer smaller pockets of protestors engaging in significant criminal acts." *WTO After Action Report* at 35. The violent protestors damaged the City and disrupted the WTO conference, but they were able to elude capture due to the tens of thousands of non-violent protestors in the downtown area. The implementation of Order No. 3 was necessary to permit police to restore and then to maintain order and safety in downtown Seattle, for WTO conference delegates and the public, and to allow officers to execute their law enforcement duties by arresting those breaking the law.[37]

---

[35]The Menotti plaintiffs and the Hankin plaintiffs argue that Order No. 3 was not narrowly tailored because the restricted zone was too large, and because the restricted zone banned protected forms of speech. In addition, the Hankin plaintiffs argue that the City should have "expend[ed] the effort necessary to ensure clear passage for the delegates to and from the [WTO conference] venues without infringing unnecessarily on protestors' rights."

[36]We are concerned here with the *effect* that the large number of peaceful protestors had on the ability of police to quell the significant criminal acts of the violent protestors. The impeding or "buffer" effect of peaceful protestors is undisputed on the record.

[37]The Hankin plaintiffs contend that "[t]here was no attempt to preserve lawful protest and arrest only those who broke the law, just an attempt to ban all protest." But the record does not support that argument. The

Citing the Supreme Court's decision in *Madsen*, as well as our decisions in *Baugh* and *Bay Area Peace Navy v. United States*, 914 F.2d 1224 (9th Cir. 1990), Appellants contend that there are cases invalidating restricted protest zones that were smaller in scope than the restricted zone implemented by Order No. 3. This argument misapprehends the case law and ignores the factual circumstances of this case. None of these cases establish a *per se* rule on the boundaries that a city may draw in creating a restricted zone during protest activities. Further, none of these cases dealt with the factual circumstances presented here: a small but dedicated group of violent protestors who inflicted disruption and destruction on city streets and threatened the safety of world leaders, while obscured and sheltered by about 50,000 peaceful protestors, all within a concentrated portion of a metropolitan downtown area. We decline Appellants' invitation to interpret the above cases as defining conclusively the appropriate scope of "narrow tailoring" in the context of establishing a buffer zone on protest activity.[38]

---

restricted zone created by Order No. 3 was implemented only after a full day of protests on November 30, 1999. Before the implementation of Order No. 3, protestors had been allowed in the downtown area, resulting in the City's police force being overwhelmed, as well as significant damage and disruption to the downtown area. If the Hankin plaintiffs contend that there was no attempt to preserve lawful protest on December 1, 1999, then that too is belied by the record. Protestors were allowed access to streets immediately adjacent to the delegates' hotels and conference sites. There was not a total bar to protest, and the scope of the restrictions must be tested under the legal standards identified above for time, place, and manner restrictions on speech.

[38]The Menotti plaintiffs also argue that Order No. 3 did not further a significant governmental interest because it permitted entry into the restricted zone of persons not engaged in protest. We disagree. There is no evidence that those permitted in the restricted zone were part of the problem addressed by Order No. 3. Persons who lived, worked, or had other business in the restricted zone could go about their business without impeding the City's ability to maintain a secure environment in the restricted zone. Though Order No. 3 contained exemptions that allowed certain persons to enter the zone, it still furthered a significant governmental interest by excluding from the zone the protest activity that was a security threat to the downtown area.

Appellants' contention that the large size of the restricted zone rendered it constitutionally impermissible ignores significant considerations that confronted City officials. As seen from the diagram of the restricted zone, the various hotels and meeting venues of the WTO conference were spread out across several blocks of downtown Seattle. The size of the restricted zone cannot sensibly be evaluated without considering the size of the area in which delegates were housed and had to move freely in order to do the work of the WTO conference. To achieve the goal of providing secure protection for WTO delegates and ensuring safe transit for delegates between venues and hotels, the City crafted the restricted zone as being bounded by the outermost venues of the conference and the hotels where delegates were staying.[39] As the district court saw it, "the [restricted] zone covered only enough territory for the WTO delegates and the President to move safely from their hotels to the [WTO] convention and lasted only during the conference."[40] We conclude the district court's analysis of this issue was sound and in accord with law.

[39]Appellants make much of a declaration submitted by a former law enforcement official, who contended that Seattle police should have used pedestrian tunnels and dedicated roadways to facilitate the movement of WTO delegates. Yet, these contentions do not address the fact that the tunnels in question did not connect all of the hotels and venues being used by WTO delegates. The suggestions in the declaration provide no practical way to stop the behavior of violent protestors in the downtown Seattle area on November 30, 1999. Moreover, Appellants' alternatives were not a feasible means for the City to balance its interest in hosting the WTO conference with reliable safety for delegates, and the demonstrators' interest in expressive activity. *See Kuba*, 387 F.3d at 862 n.12 (recognizing that suggested alternatives that are "far less restrictive and more precise means of regulating the time, place, and manner of speech" is just the first step in a "narrow tailoring" analysis, and that a court must also consider "whether the alternatives both are feasible and allow substantially more speech"). Even crediting Appellants' declarations and giving all reasonable inferences to Appellants, we cannot say that the alternatives were a feasible means to respond to the prevalent violence that gravely threatened the security of the WTO conference and the peace and order of the City.

[40]That Order No. 3 protected a "*particular method*" of getting WTO delegates to the conference does not mean, as the dissent argues, that this is the only "interest Order No. 3 actually served." *See* Dissent at 6041 n.7. As we have explained, Order No. 3 brought order and security to the core downtown area, providing safety for delegates and allowing the WTO conference to proceed as scheduled. *See* discussion *supra* at 5975-77.

We also reject Appellants' contention that the size of the restricted zone enforced by Order No. 3 was an overreaction that needlessly restricted the rights of peaceful protestors. In the context of a massive demonstration with tens of thousands of participants, once a pattern of chaotic violence had been established, it was unrealistic to expect police to be able to distinguish, minute by minute, those protestors with benign intentions and those with violent intentions. In this regard, the Supreme Court's decision in *Hill v. Colorado*, 530 U.S. 703 (2000), has particular application. In *Hill*, the Court upheld a Colorado law that made it unlawful for any person within 100 feet of an abortion clinic knowingly to approach within eight feet of another person without that person's consent to provide materials or counseling. The Court reasoned:

> [T]he [restricted zone's] prophylactic aspect is justified by the great difficulty of protecting, say, a pregnant woman from physical harassment with legal rules that focus exclusively on the individual impact of each instance of behavior, demanding in each case an accurate characterization (as harassing or not harassing) of each individual movement within the 8-foot boundary. Such individualized characterization of each individual movement is often difficult to make accurately. A bright-line prophylactic rule may be the best way to provide protection, and, at the same time, by offering clear guidance and avoiding subjectivity, to protect speech itself.

*Id.* at 729.

**[7]** Here, the size of the restricted zone was justified by the difficulty of protecting world leaders in an environment in which a small group of violent protestors were determined to cause chaos and to disrupt the conference proceedings midst tens of thousands of non-violent protestors.[41] In different cir-

---

[41]The dissent is wrong to characterize the City's means as a "poor fit" with the City's interest based on the occurrence of violence outside the

cumstances, it might be possible for law enforcement authorities, on an individualized basis, to distinguish between peaceful protestors and those with violent intentions. But in these circumstances, after the broad antagonism to the WTO

restricted zone. It is not required for our legal analysis that the City's measure to restore order where it was most needed had to maintain peace and security perfectly in all areas outside the restricted zone. The dissent's argument that Order No. 3 was not narrowly tailored because it "did not protect anyone outside of the perimeter," Dissent at 6046, ignores or minimizes the core interest addressed by Order No. 3: protecting the President and foreign dignitaries who came to Seattle to conduct the business of the WTO. The City needed to restore and maintain order in the core downtown area to achieve this interest, and Order No. 3 "targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485. We decline the dissent's suggestion that a city's means to achieve its significant interest of restoring and maintaining security can never be narrowly tailored absent a policy completely efficacious in eliminating violence. *See, e.g.*, *Ward*, 499 U.S. at 800 ("The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests *or the degree to which those interests should be promoted*.") (emphasis added); *see also City Council v. Taxpayers for Vincent*, 466 U.S. 789, 807-10 (1984) (upholding a ban on posting signs on public streets to achieve the significant public interest of "avoiding visual clutter" even though posted signs only "add somewhat" to the city's visual clutter).

Similarly, the dissent's argument that the restricted zone's size "allowed" violence to continue in areas outside the zone, Dissent at 6047, is unsupported by and contrary to the record, which places some officers and notes hundreds of arrests outside the zone. As the conference moved toward completion, and the situation calmed, police were able "to escort and monitor non-permitted demonstrations outside the perimeter in a manner consistent with permitted demonstrations." *WTO After Action Report* at 45. Moreover, the district court correctly found that the City reasonably concluded in Order No. 3 that "the level of city disturbances and danger to persons and property [was] highest in those areas in which there are protests in the vicinity of World Trade Organization ("WTO") meetings." Contrary to the dissent's assertion, the perimeter did more than protect WTO delegates; Order No. 3 brought safety and security to the downtown area, protecting businesses, their employees, and the City's citizens as well.

had ripened into pervasive illegal and violent disruptive actions, it would not have been practical to require police, on a continuing basis, to make an accurate determination of each protestor as violent or not violent. Appellants also argue that police should have had more extensive staffing on the street so that they could permit protestors to enter anywhere and simply arrest and remove those who violated the law.[42] But we should hesitate to say that the law requires such a solution in an emergency situation like that here where law-breaking and law-abiding protestors were often indistinguishable, and where those abiding the law might have interfered indirectly with enforcement against violent protestors.

Appellants contend that *Collins v. Jordan*, 110 F.3d 1363 (9th Cir. 1996), controls the outcome of this case. We disagree. In *Collins*, the Mayor of San Francisco responded to sporadic violent protests by directing police officers to "cause the dispersal and prevent the continuation of any gatherings of people anywhere in the City and County of San Francisco whenever the peace officer on the scene has reason to believe that the gathering endangers or is likely to endanger persons or property." *Id.* at 1367. We affirmed the district court's denial of qualified immunity to the officers, because "it was clear at that time, as it is today, that the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter)."[43]

_____

[42]The Menotti plaintiffs acknowledged that "the primary response of a municipality to crime should be to arrest the criminals," but faulted the City for "fail[ing] to put enough officers on the streets on November 30th to accomplish this task." The Hankin plaintiffs also criticized the City's police department plan for law enforcement, arguing that "common police tactics and planning would have provided a much more secure downtown without sacrificing speech. For example, it is common police practice to establish lines of defense around certain buildings before protestors arrive, [and] to have squads specifically intended to pursue violent individuals within crowds."

[43]Appellants contend that, since there was a decrease in violence in the hours immediately prior to the imposition of Order No. 3, this statement

*Id.* at 1372. However, we said in *Collins* that our holding was narrow:

> We need not address the question of whether at some point—for example if there is widespread continuing violence that appears to be beyond the ability of the police to control—a time-limited ban on all demonstrations might be lawful. Similarly, we need not decide whether, and under what circumstances, specific, reliable information that organized violence of a serious nature is about to occur might justify a determination that a clear and present danger exists warranting the banning of a particular demonstration.

means that here the City acted unlawfully in adopting Order No. 3. We disagree.

In *Collins*, we described the "limited violence and disorder" that had taken place as involving "a few injuries to people, none of them extensive or life-threatening. The principal incidents involved property damage and appear to have been confined to an area of about four blocks . . . . [M]ost of the city was free from any form of unlawful conduct." 110 F.3d at 1372. Here, the violence that had taken place was substantially more severe, involving assaults on police and WTO delegates, fires, medical emergencies, evacuation of retail stores, and a general loss of civic order. Moreover, *Collins* invalidated an order that banned *all* demonstrations throughout the *whole* county. In Seattle, however, protestors could still demonstrate in all City areas outside the restricted zone.

*Collins* does not hold that, when a city is confronted with violent, dangerous protests of the type in this case, it must wait for further violence to occur before taking measures to restore civic order. Despite the dissent's characterization of *Collins* as involving "a similar emergency order adopted under analogous circumstances," Dissent at 6043-44, we face a factually and legally distinguishable case, and the weight the dissent places on *Collins* again shows the dissent's minimization of the crisis in Seattle. *See also supra* note 34 (recognizing that, on the undisputed facts, the City had reason to believe and was entitled to believe that the violence attendant to the WTO conference had not ended prior to Order No. 3's enactment, but had just temporarily subsided and would resume contemporaneous with WTO proceedings).

*Id.* at 1373.

The scope of the violence that plagued Seattle on November 30, 1999, and the clear and present risks to world leaders attending the WTO conference, render *Collins* inapposite. In *Collins*, the violence that San Francisco faced before it restricted protest was much less severe than Seattle faced in this case. Further, San Francisco restricted speech throughout the whole county,[44] while Seattle merely restricted access within a well-defined security zone to facilitate a public event.[45]

Mass demonstrations involving tens of thousands of participants are an important form of political protest and have a great pedigree. Consider Martin Luther King, Jr.'s march on Washington, at which he delivered the "I Have a Dream"

[44]San Francisco County has a land area of 47 square miles. United States Census Bureau, *California Quick Facts, San Francisco County* (2000), *available at* http://quickfacts.census.gov/qfd/states/06/06075.html (last revised Feb. 1, 2005).

[45]The dissent argues that we have allowed the constitutional framework "to be shaped" by our "characterization of the level of violence." Dissent at 6043 n.12. The dissent misunderstands our application of First Amendment doctrine, which assesses the means the City used in light of the ends the City needed to achieve. We have applied the correct legal framework established by the Supreme Court. *See, e.g.*, *Ward*, 491 U.S. at 799. Under this precedent, understanding the City's interest is essential to assessing whether Order No. 3 was narrowly tailored to achieve that interest. *See, e.g.*, *id.* at 796-801. *Collins* also recognized that a heightened city interest to end and prevent violence would require a different analysis:

> Today, we decide only that the violence and disorder that occurred in San Francisco on April 30 falls far short of the type of occurrence that could have led any reasonable official to believe that it would be constitutional to impose a city-wide ban on all demonstrations, and that the law to that effect was clearly established.

110 F.3d at 1373. In our view, *Collins* does not dictate a conclusion that Order No. 3 is facially unconstitutional because *Collins* addressed a significantly broader restriction on speech enacted in response to a significantly less dire situation.

speech to a crowd of over 250,000 on the Washington Mall. When a crowd is generally peaceful, large protests do not necessarily create risks to public safety and security, even though the crowd must be managed by a city. But once multiple instances of violence erupt, with a breakdown in social order, a city must act vigorously, and more extensively, to restore order for all of its residents and visitors. Adding large numbers of police on the street might be the solution in some cases, but in other cases could lead to more intense violence. In light of the City's significant governmental interest in restoring and maintaining civic order to the core downtown area, Order No. 3 and the restricted zone it implemented were narrowly tailored.[46]

---

[46]The dissent views *Grossman v. City of Portland*, 33 F.3d 1200 (9th Cir. 1994), as presenting a "similar problem." Dissent at 6045-46. The dissent's analogy to *Grossman* is off the mark, and reflects the dissent's pervasive misapprehension of the scope of violence and disorder presented in Seattle by the WTO protests. *Grossman* addressed the City of Portland's permitting scheme as applied to a "small, peaceful anti-nuclear protest, involving six to eight people," 33 F.3d at 1201-02, and is factually inapposite to this case which involved tens of thousands of protestors and hundreds of violent and lawbreaking ones.

In addition to being factually inapposite, *Grossman*'s reasoning is not persuasive in an analysis of whether Order No. 3 was a reasonable time, place, and manner restriction. Portland's permanent permitting scheme made it unlawful "for any person to conduct or participate in any organized entertainment, demonstration, or public gathering, or to make any address, in a park without . . . written permission." *Id.* at 1204. Portland's stated interest was "protecting the safety and convenience of park users," and "maintaining normal quiet in the area adjacent to or near the park." *Id.* at 1205-06 & n.11. We held this scheme facially invalid in part because the distinction between groups displaying messages and groups not displaying messages was "absolutely empty in terms of the ordinance's stated goals." *Id.* at 1206-07. But *Grossman* did not hold or suggest that such a distinction is necessarily empty in all cases. Here, the record supports the City's distinction: The violence and disorder visiting downtown Seattle during the four days of the WTO conference was incident to the presence of protestors, not emergency personnel, business employees, or shoppers. *Grossman* in no way controls, and is not persuasive on, the constitutionality of a city's necessary but temporary response to a breakdown of civic order in an emergency setting. *Grossman* did not involve such a breakdown in order and is of no help in assessing the City of Seattle's proper response to a crisis that threatened the safety of Seattle's visitors and citizens.

**[8]** While it is plausible that Order No. 3 was not the least restrictive means of achieving the City's goal, that is not what Supreme Court precedent requires. There is no question that the governmental interest here (security of the core downtown area) would have been achieved less effectively absent Order No. 3. Our role here is not to inject ourselves into the methods of policing, and we do not do so here. *Albertini*, 472 U.S. at 689 (holding that the validity of a regulation "does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests"). We conclude that Order No. 3 was narrowly tailored to achieve a significant governmental interest.[47]

### 3

**[9]** We must also assess whether Order No. 3 left ample alternative channels of communication. We have observed that "[t]he Supreme Court generally will not strike down a governmental action for failure to leave open ample alternative channels of communication unless the government enactment will foreclose an entire medium of public expression

---

[47]The dissent incorrectly refers to our assessment of the City's interest as "confused and inconsistent" because we list the following: "protecting the president and foreign dignitaries," "maintaining public order," "providing security to the core downtown area," and "seeing that the WTO delegates had the opportunity to conduct their business." *See* Dissent at 6039-40 n.6. A rational evaluation of our discussion of the City's interest, however, yields a common thread: restoring and maintaining order to the core downtown area so that the WTO conference could proceed safely and securely.

Again, it is incorrect to urge that a city's means of restoring order is not narrowly tailored because the city has not fashioned a remedy aimed at completely eliminating disorder across the entire city. *See supra* note 42. For Order No. 3 to be narrowly tailored, Supreme Court precedent requires only that it target and eliminate "no more [as opposed to no less] than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485. The City was entitled to seek a remedy in its core area where WTO delegates resided and worked.

across the landscape of a particular community or setting." *Ctr. for Fair Pub. Policy*, 336 F.3d at 1170 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 555 (9th Cir. 1998)). A time, place, and manner restriction does not violate the First Amendment "simply because there is some imaginable alternative that might be less burdensome on speech." *Albertini*, 472 U.S. at 689. "Of course, the First Amendment does not guarantee the right to communicate one's views at all times and places or in any manner that may be desired." *Bay Area Peace Navy*, 914 F.2d at 1229 (quoting *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 647 (1981)). However, an "alternative mode of communication may be constitutionally inadequate if the speaker's 'ability to communicate effectively is threatened.' " *Id.* (quoting *Taxpayers for Vincent*, 466 U.S. at 812).

[10] The application of these principles presents a very difficult question. On the one hand, the restricted zone carved out a portion of the downtown area where protestors could not deliver their message directly to delegates. On the other hand, the protestors were able to demonstrate and express their views immediately outside the restricted zone, including areas directly across the street from the Washington State Convention & Trade Center and the Paramount Theater. The scope of the restriction on protest extended only to the bounds of the restricted zone, and did not apply generally to the City of Seattle. The protestors could reasonably expect their protest to be visible and audible to delegates, even if not as proximate as the protestors might have liked.[48]

---

[48]It cannot sensibly be argued that protesting outside the restricted zone was not a viable alternative on the mistaken theory that the delegates were not as accessible from that position. The Supreme Court has instructed that the First Amendment does not require that individuals retain the most effective means of communication, only that individuals retain the "ability to communicate effectively." *Taxpayers for Vincent*, 466 U.S. at 812; *see also Hill*, 530 U.S. at 729 (upholding a law that prohibited individuals from having a position that maximized accessibility to the target of their speech).

Given the protestors' ability to communicate directly across the street from most WTO venues, and given the violence that Order No. 3 was aimed at preventing, we think the better analysis favors the conclusion that Order No. 3 provided ample alternatives for communication. *See Hill*, 530 U.S. at 729 ("Signs, pictures, and voice itself can cross an 8-foot gap with ease."). Appellants argue that they were prevented from communicating with WTO delegates at close range, but there is no authority suggesting that protestors have an absolute right to protest at any time and at any place, or in any manner of their choosing. *Bl(a)ck Tea Soc'y v. City Of Boston*, 378 F.3d 8, 14 (1st Cir. 2004) ("[A]lthough the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.").[49]

We do not minimize the value to society of facilitating protest communications. Justice Brandeis in *Whitney v. California* gave us a classic statement on the values of free speech:

> [The Founding Fathers] believed that freedom to think as you will and to speak as you think are means indispensable to the discovery and spread of

---

[49]The district court also held that Order No. 3 provided ample alternative means for communication because protestors "had access to the media and to the public beyond the zone." The First Circuit recently expressed a similar view in resolving a challenge to a demonstration zone established by the City of Boston for the 2004 Democratic National Convention. *Bl(a)ck Tea Soc'y*, 378 F.3d at 14. The First Circuit held that the demonstration zone provided ample alternative channels for communication because "[a]t a high-profile event, such as the [Democratic National] Convention, messages expressed beyond the first-hand sight and sound of the delegates nonetheless have a propensity to reach the delegates through television, radio, the press, the internet, and other outlets." *Id.* Because we hold that there is no constitutional requirement that protestors be allowed to reach their designated audience in the precise manner of their choosing, we do not evaluate this alternative argument.

political truth; that without free speech and assembly discussion would be futile; that with them, discussion affords ordinarily adequate protection against noxious doctrine; that the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental principle of the American government.

274 U.S. 357, 375 (1927) (Brandeis, J., concurring), *overruled by Brandenburg v. Ohio*, 395 U.S. 444, 449 (1969). Chief Justice Hughes reinforced these ideas a decade later in *De Jonge v. Oregon*:

The greater the importance of safeguarding the community from incitements to the overthrow of our institutions by force and violence, the more imperative is the need to preserve inviolate the constitutional rights of free speech, free press and free assembly in order to maintain the opportunity for free political discussion, to the end that government may be responsive to the will of the people and that changes, if desired, may be obtained by peaceful means. Therein lies the security of the Republic, the very foundation of constitutional government.

299 U.S. 353, 365 (1937). The Supreme Court over decades has never departed from this commitment to First Amendment values.[50]

---

[50]In *Texas v. Johnson*, 491 U.S. 397, 414 (1989), Justice Brennan wrote for the Court, "[i]f there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable. Punishing desecration of the flag dilutes the very freedom that makes this emblem so revered, and worth revering." Justice O'Connor has also remarked that "[t]he hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003).

Perhaps it has not been said with more elegance than in these words of Justice Brennan in the landmark decision of *New York Times Co. v. Sullivan*: "[D]ebate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." 376 U.S. 254, 270 (1964).[51] However, we do not think that even the most vital First Amendment expressions—and for purposes of our analysis we consider political protest adverse to WTO activities and internationalist philosophy to be political comment at the core of the First Amendment—can be said automatically to overcome the need of a city to maintain order and security for its residents and visitors, in the face of violence. *Burson v. Freeman*, 504 U.S. 191, 197 (1992) ("At the same time, however, expressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used . . . . [T]he government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication.").

[11] Accordingly, we apply the ample alternatives test with a practical recognition of the dire facts confronting the City in the early morning hours of December 1 during the WTO conference.[52] On the evening of the first day of the WTO con-

---

[51]Though the singular importance of these First Amendment values could hardly be overstated, it also must be kept in mind that the First Amendment was held to be applicable against the States, and here a local government, through the Fourteenth Amendment's Due Process Clause. *De Jonge*, 299 U.S. at 364; *see also Palko v. Connecticut*, 302 U.S. 319, 325 (1937), (incorporating the First Amendment's protections into the Fourteenth Amendment's Due Process Clause on the view that the First Amendment's protections were "implicit in the concept of ordered liberty"), *overruled on other grounds by Benton v. Maryland*, 395 U.S. 784, 794 (1969).

[52]The dissent challenges our practical recognition of the emergency confronting the City and our pragmatic application of the ample alterna-

ference, and shortly before President Clinton was scheduled to arrive, Seattle was tense, its streets were in disarray from a long day of violent protest, and there was a general disruption of civic order. The "ample alternatives" cannot be taken to mean that *each* protestor has the right to convey his or her message in the manner preferred by that protestor—that would be impossible where, as in this case, protestors numbered in the tens of thousands. The City was required to take action to protect President Clinton and the delegates throughout the three remaining days of the conference. If the City had permitted chaos and violence to continue unabated, it would not merely lose its standing as a host city for international conferences, the City might also have sacrificed the safety of the delegates and of its residents. The permissible communications available to protestors under Order No. 3 were substantial, not perfunctory. These available communications, including protesting on the periphery of the restricted zone, were perhaps not ideal for protestors who wanted to present views in the face of delegates,[53] but neither did they wholly exclude protestors from the delegates' purview.

---

tives test as lacking affirmative precedential sanction. *See* Dissent at 6052. Our resolution of this issue is not contrary to established law and reflects the principle that there is no constitutional right to deliver a confrontational message of protest directly to an intended target. *See Hill*, 530 U.S. at 716-18 ("[W]e have continued to maintain that 'no one has a right to press even 'good' ideas on an unwilling recipient. . . . While the freedom to communicate is substantial, 'the right of every person "to be let alone" must be placed in the scales with the right of others to communicate.' "); *see also Bl(a)ck Tea Soc'y*, 378 F.3d at 14 ("[A]lthough the opportunity to interact directly with the body of delegates by, say, moving among them and distributing literature, would doubtless have facilitated the demonstrators' ability to reach their intended audience, there is no constitutional requirement that demonstrators be granted that sort of particularized access.").

The dissent's unsupported assertion that *Hill* is inapposite because WTO delegates were not "particularly vulnerable" and faced only "the unpleasantness or inconvenience of a large demonstration," *see* Dissent at 6039-40 n.6, understates the danger visiting delegates faced from violent protestors determined to derail the WTO conference.

[53]Some protestors may have preferred the restraints of Order No. 3 as an aid to their own safety, as well as that of delegates. However, for pur-

In the "ample alternatives" context, the Supreme Court has made clear that the First Amendment requires only that the government refrain from denying a "reasonable opportunity" for communication. *City of Renton*, 475 U.S. at 54 ("[T]he First Amendment requires only that Renton refrain from effectively denying respondents a reasonable opportunity to open and operate an adult theater within the city . . . ."). We hold that, because Order No. 3 allowed protestors to demonstrate directly across the street from the Washington State Convention & Trade Center, the Paramount Theater, three out of four major hotels where WTO delegates were staying, and throughout the rest of downtown Seattle, Order No. 3 provided ample alternative channels of communication.[54] We rec-

---

poses of assessing the constitutionality of Order No. 3, on the dueling summary judgment motions, we may assume that protestors generally disfavored the restraint, and had views similar to those Appellants have asserted.

[54]The record is void of evidence supporting the dissent's argument that WTO delegates could see and hear protestors *only* within the 25-square block restricted zone. *See* Dissent at 6050. Reason and precedent belie this proposition. *See Hill*, 530 U.S. at 718 (holding that protestors had ample alternatives to communicate their message even if they could not communicate with their intended audience where they preferred).

The dissent, most likely recognizing the lack of evidence to support its argument, argues that "neither does the record reflect that the delegates *could* see and hear protestors, or that the alternative means of communication available to the protestors were sufficient." Dissent at 6050 n.16. But contrary to the dissent's assertion, the undisputed facts in the record show that per the terms of Order No. 3 protestors could communicate their views directly outside most of the hotels where delegates were staying. *See* apps. A & B (showing that Order No. 3's boundary bordered delegates' hotels); *WTO After Action Report* at 46 (recognizing that protestors demonstrated at the front door of the Westin Hotel). The ability to so communicate is shown by appendices A and B. It is not disputed that major venues for delegates, as identified on the appendices, included the Four Seasons Olympic, Cavanaughs, the Sheraton, and the Westin hotels. Of these, the Four Seasons Olympic, Cavanaughs, and the Westin were located on the border of the restricted zone. Thus, the appendices show without inference that Order No. 3 did not restrain protestors from making

ognize that our decision takes into account a balance of the competing considerations of expression and order. But we do not think the Constitution requires otherwise.[55]

their views known on Fourth Avenue and on Sixth Avenue outside the restricted zone across the street from three of the four identified major venues for delegates situated in the restricted zone; only the Sheraton Hotel is not on the restricted zone's border. Consistent with Order No. 3 is the declaration of protestor Michael Gendler, submitted by the Appellants, which confirms that protest was allowed on the east side of Fourth Avenue. The appendices show that the east side of Fourth Avenue is adjacent to both Cavanaughs and the Four Seasons Olympic hotels. Order No. 3 on its face imposed no limitations on expressive activity outside the restricted zone. *See also WTO After Action Report* at 45 (noting a "group of about 1,000 people" that marched southbound on Fourth Avenue). We draw no inferences in favor of our factual statement; rather, the dissent ignores the undisputed facts that do not fit its legal theory.

Moreover, according to the undisputed declaration of Assistant Chief Clark Kimerer, there were "several downtown hotels not within the buffer zone housing WTO delegates which were excluded" because police believed they could "provide adequate security." It is also undisputed that thousands of protestors did not abandon their demonstrations, but continued them throughout the rest of the downtown area for the duration of the WTO conference. *Id.* at 43-46.

These alternative means of communication taken together are sufficient as a matter of law under Supreme Court precedent because they gave a reasonable opportunity for protestors to communicate. *See City of Renton*, 475 U.S. at 54.

[55]We reject the City's alternative contention that Order No. 3 was a permissible exercise of municipal control under a theory of an "emergency exception." Citing to out-of-circuit cases, the City argues that Order No. 3 was valid because it was taken in good faith and there was a factual basis to decide that Order No. 3 was necessary to maintain order. *See Smith v. Avino*, 91 F.3d 105, 109-10 (11th Cir. 1996), *abrogated on other grounds by Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83 (1998); *United States v. Chalk*, 441 F.2d 1277, 1280 (4th Cir. 1971); *Moorhead v. Farrelly*, 723 F. Supp. 1109, 1112-14 (D.V.I. 1989). These cases are distinguishable, and the standard that they voice does not permit a sufficiently nuanced review of the First Amendment rights at stake here. *Smith* and *Moorhead* involved natural disasters that provided little or no warning to municipalities. While *Chalk* involved civil unrest, it was the result of

**[12]** We hold that Order No. 3 was a constitutional time, place, and manner restriction on speech on its face.[56] Because

---

an unpredictable clash between police and high school students, in contrast with this case, which involved a world trade conference planned months in advance. Also, these courts employed the emergency analysis in specific and limited contexts different from that here, the contexts of natural disasters or of civil unrest confined in a smaller area, and in each case the government's tool was evening curfew. Our case involves political protest coupled with chaos and violence, followed by a restricted zone covering a large part of downtown Seattle, the core area including convention venues and delegates' hotels, with the restriction applicable, day and night, for the several remaining days of the conference. The legal analysis justifying nighttime curfew in the "emergency" cases is not controlling and does not permit adequate evaluation of the competing interests in the face of the crisis that was presented. *See also* Oren Gross, *Chaos and Rules: Should Responses to Crises Always Be Constitutional?*, 112 Yale L.J. 1011, 1027-42 (2003) (outlining several problems with doctrines of emergency powers). We decline to analyze Order No. 3 based on the "emergency" doctrine, though as we have explained above, the nature of the City's interest in security and safety has been germane to our analysis of the test for a reasonable time, place, and manner restriction.

[56]At oral argument, the Hankin plaintiffs also contended that the City should have reevaluated and reduced or eliminated the restricted zone on December 2 or December 3, after the initial imposition of Order No. 3 on December 1 had decreased the violence taking place in Seattle. We do not consider this argument because it was not raised in the Hankin plaintiffs' opening brief. *Collins v. City of San Diego*, 841 F.2d 337, 339 (9th Cir. 1988) ("It is well established in this Circuit that claims which are not addressed in the appellant's brief are deemed abandoned."). Even if we were to address this contention, the facts in this case justify the continued imposition of the restricted zone. Although Order No. 3 had the effect of decreasing violence in Seattle on December 1, there was undisputed evidence that violence continued outside the restricted zone on December 2 and December 3, including an incident where protestors surrounded the King County Jail (resulting in a lockdown of the jail). Given the events that had taken place on November 30 and the ongoing violence from December 1 to December 3, the City was justified in maintaining the restricted zone to preserve order and security in the downtown area until the WTO conference concluded. The restriction here lasted only four days. Were we faced with such a restriction on public access over weeks or months, a duty to reevaluate surely would arise at some point. But here, the initial evaluation on December 1, in light of the limited duration of the conference, is reasonably proximate to the duration of restraint.

we hold that Order No. 3 was a valid time, place, and manner restriction,[57] we need not reach Appellants' contention that Order No. 3 was a prior restraint. *Baugh*, 187 F.3d at 1042 ("[E]ven prior restraints may be imposed if they amount to reasonable time, place, and manner restrictions on speech.").[58]

## B

**[13]** Appellants contend that Order No. 3 (and Assistant Chief Ferguson's Operations Order) improperly gave unfettered discretion to officers charged with enforcing the Order. The Supreme Court has required that "a time, place, and manner regulation contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 323 (2002). A regulation granting unfettered discretion to officials charged with administering that regulation is impermissible because it creates two dangers. First, such a regulation may "intimidate[ ] parties into censoring their own speech, even if

---

[57]We also note that the district court exercised supplemental jurisdiction over Appellants' claims under the Washington State Constitution, and dismissed those claims on summary judgment. Viewing these claims as a facial challenge, we note that Washington interprets its free speech clause in its Constitution in a manner parallel to the federal Constitution's First Amendment interpretation, except that Washington courts "diverge from the Supreme Court on the state interest element of the time, place, and manner test, as [the Washington courts] believe restrictions on speech can be imposed consistent with [the Washington Constitution's free speech clause] only upon showing a compelling state interest." *Collier v. City of Tacoma*, 854 P.2d 1046, 1051 (Wash. 1993) (en banc). We hold that the City's interest in restoring and maintaining safety and security also was a "compelling state interest" within the meaning of Washington law, because "the purpose [is] a fundamental one and [Order No. 3] bear[s] a reasonable relation to the achievement of the purpose." *See id.* at 1054. Thus, we affirm the district court's summary judgment dismissal of Appellants' challenge to the validity of Order No. 3 under the Washington State Constitution.

[58]The First Circuit recently rejected a similar argument in *Bl(a)ck Tea Soc'y*, 378 F.3d at 12.

the discretion and power are never actually abused." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988); *see also Griefen*, 200 F.3d at 1262. Second, unfettered discretion may permit the administering officials "to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade according to their own opinions regarding the potential effect of the activity in question on the 'welfare,' 'decency,' or 'morals' of the community." *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969); *see also Griefen*, 200 F.3d at 1262.

We addressed this issue in *Griefen*. There, the Forest Service had issued a closure order excluding the public from coming within 150 feet of a portion of the Nez Perce National Forest that was closed for construction and repair. *Griefen*, 200 F.3d at 1258. The closure order had exempted persons with a permit authorizing entry, law enforcement officials, rescue workers, and employees of the construction company doing work in the restricted zone. *Id.* Appellants challenged the closure order contending, *inter alia*, that the Forest Service had too much discretion in administering the closure order. *Id.* at 1262. We rejected this contention, explaining that "[i]f a closure of a public forum is for a valid rather than a disguised impermissible purpose, the potential for self-imposed or government censorship . . . does not exist." *Id.* We held:

> In First Amendment terms, the fact that discretion to authorize entry to a closed area may be unfettered during construction is of no concern. The process of granting authority to enter a lawfully closed zone differs markedly from the process of licensing expressive activity. Such a process does not "engender identifiable risks to free expression . . . ."

*Id.* at 1263 (quoting *City of Lakewood*, 486 U.S. at 757).

*Griefen* is instructive in evaluating how Order No. 3 was implemented through the Operations Order.[59] We have determined that, on its face, Order No. 3 was a lawful time, place, and manner restriction on speech.[60] Thus, portions of downtown Seattle covered by Order No. 3 were lawfully closed with limited exceptions for public safety officials, business owners, managers, or employees, and their customers.

---

[59]The dissent argues that *Griefen* is inapposite because "the area into which the plaintiffs sought entry to protest had temporarily lost its status of public forum." Dissent at 6054 n.17. The dissent incorrectly reads *Griefen*, taking the sentence it relies upon out of context. In *Griefen* we said that "the immediate area of a construction zone is not an area that *has the attributes* of a public forum." 200 F.3d at 1261 (emphasis added). We also held in *Griefen* that "[w]hen expressive conduct occurs on *public grounds*, like a national forest, the government can impose reasonable time, place, and manner restrictions," *id.* at 1259-60 (emphasis added), and "[i]f a closure of a *public forum* is for a valid rather than a disguised purpose, the potential for self-imposed or government censorship . . . does not exist." *Id.* at 1262 (emphasis added). Moreover, we had "no doubt" in *Griefen* that "a government entity may close areas of public forests under construction and repair," just as we had "no doubt" that a city "could temporarily close for good reasons . . . a street engulfed in a riot or an unlawful assembly." *Id.* at 1263.

The closure order we addressed in *Griefen* closed part of the Nez Perce National Forest, which doubtless is and was a public forum. In any event, in *Griefen* we analyzed not only the reasonable time, place, and manner issues, *id.* at 1259-62, but also the protestors' unbridled discretion challenge on the premise that the order closed a public forum. *Id.* at 1262-65. Similarly, our analysis in this case of the reasonable time, place, and manner issues raised by the Appellants proceeds on the premise that Order No. 3 closed a public forum. *See* discussion *supra* Part III.A. Likewise, our analysis of Appellants' unbridled discretion challenge proceeds on the premise that Order No. 3 resulted in "a closure of a public forum [ ] for a valid rather than a disguised purpose." *See Griefen*, 200 F.3d at 1259-60.

[60]The dissent appeals to *Board of Airport Commissioners v. Jews for Jesus*, 482 U.S. 569, 573 (1987), but that case is inapposite as it involved a speech restriction held to be facially unconstitutional under the First Amendment's overbreadth doctrine. Moreover, Order No. 3 did not receive a "virtually open-ended interpretation," but rather contained express limits on whom officers could exclude from the restricted zone, such as WTO personnel, workers, and public safety officials.

**[14]** That officers had discretion to permit persons with a reasonable purpose to enter the restricted zone does not render Order No. 3 constitutionally deficient.[61] Order No. 3 facially restrained officers from excluding certain persons specifically authorized to enter the restricted zone, and the Operations Order clarified the phrase "reasonable purpose" specifically to include "work, shopping at a specific location . . . , or other like type reasonable activity." We have upheld a grant of official discretion to interpret what is "reasonable" in restricting speech to further a significant government interest. *See S. Oregon Barter Fair v. Jackson County*, 372 F.3d 1128, 1139-41 (9th Cir. 2004) (rejecting an unfettered discretion argument where the statute gave a governing body power to "charge permit applicants a fee *reasonably* calculated to reimburse the county for its *reasonable* and *necessary* costs in receiving, processing and reviewing applications for permits to hold outdoor mass gatherings" (emphases added)). Should a pattern of abuse result from an official's exercise of discretion, the proper remedy is not to "insist[ ] upon a degree of rigidity that is found in few legal arrangements," but rather is to seek remedy through as-applied challenges. *Chicago Park Dist.*, 534 U.S. at 325; *S. Oregon Barter Fair*, 372 F.3d at 1139.

Persons intending to protest were limited in time, place, and manner of their speech, but were not intimidated into censoring their speech because all protest activity was prohibited for a valid purpose in the restricted zone and speech was not restrained immediately outside the restricted zone. Further,

---

[61]The dissent intimates that any statute that gives an officer discretion to administer speech restrictions is unconstitutional because it provides "the *opportunity* for abuse." *See* Dissent at 6054. Our dissenting colleague overstates the reach of the First Amendment's unbridled discretion doctrine. A literal "opportunity for abuse" may be present whenever an armed officer of the law is given authority to enforce a speech restriction. We are concerned instead with whether Order No. 3's contained "adequate standards to guide the official's decision and render it subject to effective judicial review." *Chicago Park Dist.*, 534 U.S. at 323 (2002).

there was no danger on the face of Order No. 3 that officers enforcing the restricted zone could indiscriminately withhold permission to speak. Order No. 3 prohibited protest *on any topic* within the restricted zone. Order No. 3 and the supplemental Operations Order did not give officers administering the Orders discretion to allow persons with "favored" views inside the zone and to exclude those with "disfavored" views. Regardless of topic or viewpoint, protestors were prohibited from the restricted zone, as were others who did not fall within the limited exceptions.

[15] Assistant Chief Joiner's Operation Order gave officers guidance (including specific examples) of which individuals were permitted into the restricted zone.[62] The Operations Order said, "[v]ehicles and/or pedestrians . . . are authorized access inside the perimeter if they have a reasonable purpose for entering the perimeter. A reasonable purpose includes work, shopping at a specific location within the perimeter, or

---

[62]The Menotti plaintiffs contended at oral argument that, under *Hague v. Committee for Indus. Org.*, 307 U.S. 496 (1939), the fact that officers had any discretion to admit persons into the restricted zone rendered Order No. 3 and the Operations Order unconstitutional. We disagree. In *Hague*, the ordinance allowed a city official to deny a permit for a public meeting for any reason believed by the official to be "proper," provided that the denial was for the purpose of "preventing riots, disturbances, or disorderly assemblage." *Id.* at 502 n.1; *see also Forsyth County v. Nationalist Movement*, 505 U.S. 123, 133 (1992) (holding that a county's parade ordinance granted excessive discretion to a county administrator as to the proper amount to charge for a parade permit, where there were "no articulated standards either in the ordinance or in the county's established practice" and the city administrator was "not required to rely on any objective factors" to determine the proper fee). These cases do not constitutionally prohibit the grant of any discretion to city officials. Rather, the cases hold that city officials must be guided by objective factors and standards when making decisions pursuant to a city ordinance that restricts speech. Here, officers were instructed to grant entrance into the restricted zone to those persons who had a "reasonable purpose" (defined to include "work, shopping at a specific location within the perimeter, or other like type reasonable activity") to enter the zone. The Menotti plaintiffs' argument on this score is unpersuasive.

other like type reasonable activity."[63] As in *Chicago Park District*, "[t]hese grounds [were] reasonably specific and objective, and [did] not leave the decision to the whim of the administrator." 534 U.S. at 324 (internal quotation marks and citation omitted); *see also S. Oregon Barter Fair*, 372 F.3d at 1132; *cf. Gaudiya Vaishnava Soc'y v. City and County of San Francisco*, 952 F.2d 1059, 1065-66 (9th Cir. 1991) ("The ordinance [violates the First Amendment because it] provides no specific grounds for granting or denying permits: no explicit limits are placed on the Chief of Police's discretion."). We hold that Order No. 3 and the Operations Order did not provide unfettered discretion to officers who were administering the restricted zone.

## C

We next address the plaintiffs' contention that Order No. 3 was unconstitutional "as applied." "An as-applied challenge alleges that the restriction on speech is unconstitutional as applied to the litigant's particular speech activity, even though the law may be capable of valid application to others." *Kuba v. 1-A Agric. Ass'n*, No. 02-16989, slip op. 14635, 14645 (9th Cir. Oct. 19, 2004) (internal quotation marks omitted) (quoting *Foti v. City of Menlo Park,* 146 F.3d 629, 635 (9th Cir. 1998)).[64] The district court concluded that Order No. 3 as

---

[63]The dissent argues that the Operations Order allowed "officers to determine unilaterally what constitutes a 'reasonable purpose,' with no further elaboration on what might be considered 'other like type reasonable activity' " Dissent at 6056. The dissent's selective quotation ignores the guidance provided by the enumeration of specific activities that constituted a "reasonable purpose," such as working or shopping. That the Operations Order listed these commercial activities served to "guide the official's decision and render it subject to effective judicial review." *Chicago Park Dist.*, 534 U.S. at 323.

[64]In *Kuba* we addressed a facial and as-applied challenge to a state association's policy that prohibited individuals from demonstrating at the association's rodeo and circus, except in designated "free expression zones." *Kuba*, 387 F.3d at 853-55. We held the policy facially unconstitutional

applied to the Hankin plaintiffs was a valid time, place, and manner restriction. The Hankin plaintiffs contend that Order No. 3 was unconstitutional as applied to them because the City had adopted a policy of arresting only anti-WTO protestors within the restricted zone.

---

because the association failed to prove how a handful of demonstrators would cause congestion or a danger to safety, *see id.* at 859-60, and because the association's policy was not narrowly tailored when it penned demonstrators in "three small, fairly peripheral areas" and did not "sufficiently match" the interest of preventing congestion that could have been achieved with equal effectiveness but less speech-restrictive alternatives, *see id.* at 861-62. *Kuba* differs from the case before us because *Kuba* did not involve significant prior violence such as had marred Seattle. The corresponding governmental interest in *Kuba*, in preventing congestion with potential impact on safety, before the congestion occurred, was less than Seattle's interest in restoring order, after widespread violence, including vandalism and riot.

**Volume 2 of 2**

Hankin submitted a declaration in opposition to the City's motion for summary judgment in which he testified that, on December 1, 1999, he participated in a group march and protest at Westlake Park within the restricted zone. Hankin testified that police surrounded the group and arrested them without any warning, and without any determination as to whether those persons were within the exemptions to Order No. 3. Hankin testified that, immediately after arresting the large group of protestors Seattle police then turned to another portion of Westlake Park, where Hankin was standing, and arrested him and others beside him without determining whether these persons came within the exemptions to Order No. 3. Accepting Hankin's declaration testimony as true, as we must for the purposes of reviewing the district court's grant of summary judgment to the City, Hankin's testimony is evidence that the arrest of this group of persons was a "dis-

criminatory enforcement of a speech restriction amount[ing] to viewpoint discrimination in violation of the First Amendment." *Foti*, 146 F.3d at 635; *see also Police Dept. v. Mosley*, 408 U.S. 92, 95 (1972) (invalidating, on Equal Protection grounds, a disorderly conduct ordinance which barred picketing within 150 feet of a school in session, but exempted peaceful picketing of any school involved in a labor dispute, because "the operative distinction is the message on a picket sign").

**[16]** The City may be held liable for such a violation only if the arresting officers' conduct was a product of City policy or custom. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691-694 (1978). As we have explained: "Liability may attach to a municipality only where the municipality itself causes the constitutional violation through 'execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy.' " *Ulrich v. City and County of San Francisco*, 308 F.3d 968, 984 (9th Cir. 2002) (quoting *Monell*, 436 U.S. at 694). A municipal "policy" exists when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (plurality opinion); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam).

**[17]** There are three ways to show a policy or custom of a municipality: (1) by showing "a longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity;" (2) "by showing that the decision-making official was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision;" or (3) "by showing that an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Ulrich*, 308 F.3d at 984-85 (internal quotation

marks and citations omitted). We have held that a municipal policy "may be inferred from widespread practices or evidence of repeated constitutional violations for which the errant municipal officers were not discharged or reprimanded." *Nadell v. Las Vegas Metro. Police Dept.*, 268 F.3d 924, 929 (9th Cir. 2001) (internal quotation marks and citation omitted).

Although Schell (as then-Mayor of the City) was the City's chief policymaker at the time Order No. 3 was implemented, he testified in deposition that he had "relied on the [police] officers to carry out [Order No. 3] and make sure we had a secure zone for our — for the safety of our citizens and the safety of the delegates." Thus, Schell can be said to have "delegated that authority to . . . a subordinate," in this case, Police Chief Stamper. *See Ulrich*, 308 F.3d at 985. Chief Stamper, in turn, delegated the responsibility of planning the City's response to the WTO protests to Assistant Chief Joiner. Joiner, in explaining the City's implementation of Order No. 3, said that: "We're going . . . to take the core area where the [WTO] conference is occurring . . . and prohibit any demonstrations within that core area for the remainder of the week."

In support of their contention that the City had adopted a policy of suppressing anti-WTO speech in applying Order No. 3, the Hankin plaintiffs submitted declarations[65] from persons stating that police refused to allow them to enter the restricted zone, even though they came within one of the exceptions to Order No. 3, unless they removed anti-WTO buttons or stickers.[66] Martha Ehman testified in a declaration that on Decem-

---

[65]These declarations were submitted in support of the Menotti plaintiffs' motion for partial summary judgment, and in opposition to the City's motion for partial summary judgment.

[66]Former-Police Chief Stamper also testified via declaration that "the action of the officers [administering the restricted zone] when confronted with that WTO slash through it . . . was, you know, take the symbol away, put it in your backpack, or whatever the solution was to that particular problem."

ber 1, 1999, officers enforcing the restricted zone permitted her to enter after she said that she was going to work in the restricted zone. She testified that, after being permitted to enter, officers told her to stop and remove a piece of tape from her backpack that had the words "NO WTO" on it, and that officers told her she would be arrested if she did not comply. Ehman removed the tape and was allowed to proceed. Lauren Holloway testified in a declaration that, on December 1, 1999, officers enforcing the restricted zone forcibly removed anti-WTO stickers from her clothing on the basis that she was in the "No Protest Zone." Ronald Matyjas testified that, on December 1, 1999, while walking to his office located in the restricted zone, an officer told him that he could not wear the "No WTO" sign that he had affixed to his jacket, and that another officer tore off the sign without permission. Andrew Russell testified that, on December 1, 1999, he was refused entry into the restricted zone because he was wearing a button that said "No WTO," and only after removing the button was he was allowed into the restricted zone. Rita Herkal testified that, on December 1, 1999, officers forcibly removed anti-WTO stickers from her clothing, and that officers told her "You're not allowed to wear stickers."

[18] The statements of Assistant Chief Joiner and the declarants, taken in the light most favorable to Appellants, create a genuine issue of material fact as to whether it was the policy of the City to apply Order No. 3 in a manner that excluded only anti-WTO protestors. Viewing the evidence in the light most favorable to the Hankin plaintiffs, such a policy may be inferred due to the "widespread practices or evidence of repeated constitutional violations" and the absence of evidence that police officers were discharged or reprimanded for making the discard of anti-WTO expressive materials an entry ticket to the restricted zone. *See Nadell*, 268 F.3d at 929 (internal quotation marks and citation omitted). We reverse the district court's grant of summary judgment to the City on the constitutionality of Order No. 3 as applied to the Hankin plaintiffs, and we remand this issue for trial. Because we so

hold, we reverse the district court's order denying class certi-
fication and remand that issue to the district court for reconsider-
ation.[67]

However, we affirm the grant of summary judgment to
individual defendants Schell and Stamper regarding the
Hankin plaintiffs' claims against them. "Supervisory liability
is imposed against a supervisory official in his individual
capacity for his own culpable action or inaction in the train-
ing, supervision, or control of his subordinates, for his acqui-
escence in the constitutional deprivations of which the
complaint is made, or for conduct that showed a reckless or
callous indifference to the rights of others." *Larez v. City of
Los Angeles*, 946 F.2d 630, 646 (9th Cir. 1991) (internal
punctuation, quotation marks, and citations omitted). Here,
Appellants have presented no evidence, other than the adop-
tion of Order No. 3 and the Operations Order, that either
Schell or Stamper personally took part in the alleged constitu-
tional violations or caused the constitutional violations
through their individual actions. We have already held Order
No. 3 to be facially constitutional, and without evidence that

---

[67]As Order No. 3 was on its face a reasonable time, place, and manner
restriction, it follows that all persons who did not enter or who were
excluded from the restricted zone because of that order cannot assert a
valid claim individually or as a class member. However, any persons who
were excluded solely because of the content of their visible communica-
tions without regard to the exemptions within Order No. 3, or those such
as employees and shoppers, who came within Order No. 3's exemptions,
but who were allowed to enter the restricted zone only after removing visi-
ble communications, such as buttons or stickers, hostile to the WTO, may
assert an as-applied First Amendment claim. Their ability to assert a claim
against the City, as contrasted with a claim against the specific officers
with whom they interacted, will depend on the factual determination
whether their claim is based on a policy of the City of Seattle, an issue on
which we have identified a genuine issue of material fact requiring trial.
As to any such claimants, we express no opinion whether the requirements
for class action certification may be satisfied, leaving that issue for initial
consideration in the district court after any due and appropriate proceed-
ings.

Schell and Stamper personally played a role in the alleged constitutional violations, either directly or by acquiescence or culpable indifference, there is no basis for liability against them in their individual capacities. The evidence presented by the plaintiffs was not sufficient to establish or create a genuine issue of material fact concerning the supervisory liability of Schell or Stamper.

## IV

### A

We turn to the individual claims of the Menotti plaintiffs. With regard to Menotti, the district court concluded that Seattle police had probable cause to believe Menotti had committed the crime of pedestrian interference[68] and obstructing a police officer.[69] The district court granted summary judgment on Menotti's Fourth Amendment claim and state law false arrest claim. The district court also granted summary judgment to the City on Menotti's First Amendment claim, holding that Menotti had failed to present evidence that the officers who arrested Menotti acted under a City policy. Menotti appeals the district court's grant of summary judgment to the City and denial of his motion for summary judgment on these issues.

---

[68]Seattle Municipal Code section 12A.12.015 prohibits pedestrian interference. A person commits pedestrian interference where the person, *inter alia*, "intentionally obstructs pedestrian or vehicular traffic." To "obstruct pedestrian or vehicular traffic" is defined as "to walk, stand, sit, lie, or place an object in such a manner as to block passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact." Seattle Mun. Code § 12A.12.015.

[69]Seattle Municipal Code section 12A.16.010 prohibits obstructing a public officer. A person obstructs a peace officer where the person, *inter alia*, "[i]ntentionally and physically interferes with a public officer" or "[i]ntentionally hinders or delays a public officer by disobeying an order to stop given by such officer." Seattle Mun. Code § 12A.16.010.

We first address whether the police had probable cause for Menotti's arrest. "The test for probable cause is whether facts and circumstances within the officers' knowledge are sufficient to warrant a prudent person, or one of reasonable caution, to believe, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *United States v. Puerta*, 982 F.2d 1297, 1300 (9th Cir. 1992) (internal punctuation, quotation marks, and citation omitted). The question presented on Menotti's Fourth Amendment claim is whether a prudent person in the position of the officers who arrested Menotti would have believed that Menotti was committing the offenses of pedestrian interference and obstructing an officer.

**[19]** Menotti submitted video evidence showing that just before his arrest Menotti addressed a small group while pedestrians unaffiliated with the group walked by unimpeded. This evidence is contradicted by the deposition testimony of Seattle Police Officer Christopher Myers, one of the officers who arrested Menotti, who testified that he saw Menotti "causing a group to block both vehicular and pedestrian traffic." We, of course, are not empowered to make factual determinations when faced with conflicting evidence. In this procedural context, where summary judgment was given to the City, we must credit the video evidence submitted by Menotti, and consider all evidence in the light most favorable to Menotti. Menotti's video evidence showed that neither he nor the group he addressed interfered at all with pedestrians, and a reasonable jury could find from this evidence, if the jury failed to credit Officer Myers's testimony, that the officers did not have probable cause to arrest Menotti. A genuine issue of material fact concerning whether pedestrians were impeded by Menotti exists, and requires trial for resolution. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-57 (1986).

**[20]** We also hold that a genuine issue of material fact exists as to whether police had probable cause to arrest Menotti for obstructing an officer. Menotti testified in deposi-

tion that when officers approached his group, the officers issued no directives or warnings, and that he ran because the officers wanted the group to disperse. Similarly, the video evidence submitted by Menotti does not show any obvious audible warnings by police immediately before Menotti's arrest. In contrast, Officer Myers testified in deposition that, when officers approached Menotti's group, they yelled "stop, police," and that Menotti started running immediately thereafter. Whatever may be decided by the trier of fact, at the summary judgment stage we must credit Menotti's testimony and conclude that a reasonable jury could determine that there was not probable cause to arrest Menotti for obstructing an officer. A genuine issue of material fact exists whether there was probable cause to arrest Menotti for obstructing an officer, and this issue also must be resolved by trial.

[21] We hold that the district court erred by granting summary judgment for the City on Menotti's Fourth Amendment claim. We reverse the district court's grant of summary judgment dismissing Menotti's § 1983 claim under the Fourth Amendment and his state law false arrest claim. We remand these claims to the district court for further proceedings.

We turn to Menotti's First Amendment claim. Menotti alleged in his complaint that the City violated his First Amendment rights when officers arrested him. The district court granted summary judgment to the City, reasoning that Menotti "failed to produce sufficiently probative evidence of any City policy or custom that caused a deprivation of his constitutional rights." Based on our ruling above that there is a genuine issue of material fact whether the City had a policy during the WTO conference of suppressing anti-WTO views of persons who might otherwise have qualified for entry into the restricted zone, we reverse the district court's judgment on this issue and remand it to the district court for trial.

## B

Sellman was arrested for distributing leaflets within the restricted zone, and the viability of his claims depends entirely on the resolution of his constitutional challenge to Order No. 3. Sellman presented no evidence that he was targeted for arrest because of his anti-WTO views. Rather, the undisputed testimony revealed that Sellman was arrested only after Detective Stevens ascertained that Sellman had violated Order No. 3 by being in the restricted zone when he did not come within one of its exceptions, and further that Sellman did not obey an order to disperse. We affirm the district court's grant of summary judgment in favor of defendants on Sellman's claims.[70]

## C

Stedl testified in deposition that his bag was unlawfully searched and his fliers unlawfully seized by an unidentified officer. Stedl contended that the City was liable, based on 42 U.S.C. § 1983, for an unlawful search and seizure. The district court granted summary judgment for the City on Stedl's claim, holding that Stedl had not presented evidence of a City policy to commit unlawful seizures. As we have already explained, to prevail on a theory of municipal liability, Stedl must show that the unidentified officer acted pursuant to an

---

[70]The parties dispute whether Sellman appeals the district court's grant of summary judgment to Officer Stevens, the officer who arrested Sellman. Sellman's only reference to Officer Stevens in his opening brief was a statement that "[s]ummary judgment should be entered in Sellman's favor, with remand to determine the damages caused by the City, Schell, Stamper, and Stevens." Because this contention was not supported by argument in Sellman's opening brief, we deem it waived. *Humble v. Boeing Co.*, 305 F.3d 1004, 1012 (9th Cir. 2002) ("Issues raised in a brief but not supported by argument are deemed abandoned absent manifest injustice."); *see also* Fed. R. App. P. 28(a)(9)(A) (requiring that appellant's brief must contain "appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

official policy or custom of the City. *Monell*, 436 U.S. at 691-694; *Ulrich*, 308 F.3d at 984.

There was no evidence of any City policy authorizing the search of backpacks or the seizure of fliers. Stedl argues that such a policy may be inferred from an alleged pattern of such practices by officers during the WTO conference, but he offered deposition testimony of only two persons, himself and one other protestor, who said that police had unlawfully searched their bags. Even viewing the evidence in the light most favorable to Stedl, he has not offered evidence proving the first method of satisfying *Monell*'s policy requirement: there was not evidence of a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local government entity." *Ulrich*, 308 F.3d at 984 (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989)). Similarly, Stedl didn't show "that [the unidentified officer] was, as a matter of state law, a final policymaking authority whose edicts or acts may fairly be said to represent official policy in the area of decision." *Id.* at 985 (internal quotation marks omitted). Nor did Stedl's evidence establish that "an official with final policymaking authority either delegated that authority to, or ratified the decision of, a subordinate." *Id.* A showing of constitutional wrong by a single police officer may support a claim against that officer, but a claim against a municipality may proceed only with evidence that the officer acted under the municipality's policy or custom. Here, Stedl did not show that the unidentified officer acted under an official policy or custom of the City.

We affirm the district court's summary judgment in favor of the City on Stedl's claims.

## D

Skove brought First Amendment and Fourth Amendment claims against Officer Smith for Smith's seizure of Skove's

sign.[71] The district court concluded that Smith was entitled to qualified immunity on Skove's Fourth Amendment claim because Smith had probable cause to believe that Skove had committed a crime (violating Order No. 3), and because the seizure involved exigent circumstances. The district court also granted summary judgment to Smith on Skove's First Amendment claim, holding that Smith's actions were a valid time, place, and manner restriction on speech. Skove appeals the district court's grant of summary judgment to Smith on both claims.

We review the district court's grant of qualified immunity de novo. *Elder v. Holloway*, 510 U.S. 510, 516 (1994). Under *Saucier v. Katz*, 533 U.S. 194 (2001), we take a two-step approach in determining whether Smith is entitled to qualified immunity. First, we determine whether Smith violated Skove's constitutional right. *Id.* at 200-01. If we answer in the affirmative, we proceed to determine whether that right was "clearly established" such that "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 201-02. If we determine at the first step that there was no constitutional violation, that ends the qualified immunity inquiry. *Id.*

We address Skove's Fourth Amendment claim and consider whether Smith violated Skove's constitutional rights by seizing Skove's sign. Under the Fourth Amendment, the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. The Supreme Court has held that "in the ordinary case, seizures of

---

[71]In his complaint, Skove alleged that Order No. 3 was unconstitutional as applied to him, and that Officer Smith violated Skove's First Amendment and Fourth Amendment rights in seizing Skove's sign. Skove did not allege in his complaint that the City was liable under a theory of municipal liability for an alleged Fourth Amendment violation stemming from Smith's seizure of his protest sign.

personal property are unreasonable within the meaning of the Fourth Amendment, without more, unless . . . accomplished pursuant to a judicial warrant issued by a neutral and detached magistrate after finding probable cause." *Illinois v. McArthur*, 531 U.S. 326, 330 (2001) (internal quotation marks omitted). However, when faced with "special law enforcement needs," the Supreme Court "has found that certain general, or individual, circumstances may render a warrantless search or seizure reasonable."[72] *Id.*

[22] Smith contends that his seizure of Skove's sign was lawful because Smith had probable cause to arrest Skove for being in the restricted zone and not within Order No. 3's exemptions. We agree that Smith had probable cause to arrest Skove because, by engaging in protest inside the restricted zone without evidence that he was exempt, Skove had violated Order No. 3. However, it is uncontested that Smith did not arrest Skove. Had Skove been arrested, ample precedent would permit a search or seizure "incident to arrest." *Knowles v. Iowa*, 525 U.S. 113, 116-17 (1998) (noting that the two historical rationales for the search incident to arrest exception are "(1) the need to disarm the suspect in order to take him into custody, and (2) the need to preserve evidence for later use at trial"). We decline to extend the doctrine of "search incident

---

[72]Exceptions to the warrant requirement, for example, include administrative searches, *Donovan v. Dewey*, 452 U.S. 594, 598 (1981), searches incident to arrest, *see United States v. Edwards*, 415 U.S. 800, 802-03 (1974), automobile checkpoint searches, *see Mich. Dep't of State Police v. Sitz*, 496 U.S. 444, 455 (1990), reasonable detention of suspects during the execution of a search warrant, *see Michigan v. Summers*, 452 U.S. 692, 702-05 (1988), limited searches for weapons based on reasonable suspicion, *see Terry v. United States*, 392 U.S. 1, 27 (1968), and exigent circumstances, *see United States v. Place*, 462 U.S. 696, 701 (1983). We have defined exigent circumstances to include "those circumstances that would cause a reasonable person to believe that entry . . . was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConnery*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc).

to arrest" to give protection for a warrantless search or seizure when no arrest is made. It may be that Officer Smith declined to arrest Skove because Skove walked away and Officer Smith decided to maintain his post. Whatever Officer Smith's reason for not making the arrest, the seizure cannot be justified as incident to an arrest. Had an arrest been made, Smith could argue the sign was seized as evidence, *McArthur*, 531 U.S. at 331-32, but without an arrest, we do not see how Smith legitimately could be concerned about a need to preserve evidence of a crime from being destroyed.[73]

[23] There is some merit to the argument that where there is probable cause to arrest, evidence of the crime may be seized and the seizure considered valid even if the arrest is not completed. *See Roaden v. Kentucky*, 413 U.S. 496, 504 (1974) (recognizing that "the probable cause for an arrest might justify the seizure of weapons, or other evidence or instruments of a crime, without a warrant"). A supporting reason would be that police in some settings might have to disregard competing duties to pursue and complete an arrest where, as here, a suspect walks away. Yet, we reject this position because, if police aims to arrest are so weak that they do not detain a suspect, then it seems incongruous to say that a seizure of evidence can be lawfully made without a warrant. We decline to extend the exception to warrant requirements for seizures incident to arrest to instances in which a police officer seizes evidence of a crime, but makes no arrest.

Viewing the evidence in the light most favorable to Skove, as we must in reviewing the district court's grant of summary judgment to Smith based on qualified immunity, when Smith

---

[73]Smith argues that Skove voluntarily abandoned Skove's interest in the sign when he walked away from Smith after the seizure. This argument misses the point. The sign was seized before Skove walked away. The lawfulness of the seizure had to be shown based on evidence existing before or at the time of the seizure. Skove's departure after the sign's seizure is not material on this score.

encountered Skove there was no exigency requiring seizure of Skove's sign without a warrant. When the encounter took place on December 2, 1999, Seattle police had met with tens of thousands of non-violent and violent protestors who had inflicted severe damage on the downtown, which led to the City's promulgation of Order No. 3. The City's law enforcement resources (and officers themselves) had been taxed severely. But Smith faced a relatively calm situation at the point and time he encountered Skove on December 2. The City did not present evidence that Smith was dealing with violent protestors when he encountered Skove. By contrast, Smith's deposition testimony indicated that, just before he saw Skove, Smith was talking with a fellow officer and "taking in the atmosphere." Viewing the evidence in the light most favorable to Skove, Smith when seizing Skove's sign was not then actively engaged in preventing others from entering the restricted zone, nor was he immediately engaged in combating violence. In fact, Skove submitted video evidence that, in the light most favorable to Skove, shows that others were not immediately present and the circumstances were not exigent when Smith confronted Skove and seized his sign.

**[24]** We also decline to establish a general exception to the Fourth Amendment's warrant requirement for conduct that, absent special needs consistent with the Supreme Court's precedents, is asserted to be "reasonable." It has long and consistently been the law that exceptions to the warrant requirement preceding searches and seizures are for defined categorical circumstances. *See McArthur*, 531 U.S. at 330-31 (listing examples of exceptions to the warrant requirement). Because an arrest was not made, and no established exception justifies the warrantless seizure on undisputed facts, we conclude that there is a genuine issue of material fact bearing on exigency and whether Smith's seizure of Skove's sign violated the Fourth Amendment's protection against unreasonable seizures.

We proceed to the second step of qualified immunity analysis, under which we must determine whether the right was clearly established. *Saucier*, 533 U.S. at 201. We have held:

> Whether a right is "clearly established" for purposes of qualified immunity is an inquiry that must be undertaken in light of the specific context of the case, not as a broad general proposition." In other words, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right."

*Graves v. City of Coeur d'Alene*, 339 F.3d 828, 846 (9th Cir. 2003) (quoting *Saucier*, 533 U.S. at 201-02) (alteration in original).

[25] The question before us then becomes whether a reasonable officer in Smith's position would have understood that he could not lawfully seize Skove's sign absent an arrest of Skove or exigent circumstances. We have rejected the position that a seizure could be made based on probable cause to arrest, when the arrest was not completed. Moreover, viewing the evidence in the light most favorable to Skove, we cannot say that the circumstances were indisputably exigent at the time and place Officer Smith confronted Skove and seized his sign. Because the exceptions to the Fourth Amendment's warrant requirement have been categorically defined, and because "in the ordinary case, seizures of personal property are unreasonable within the meaning of the Fourth Amendment . . . unless . . . accomplished pursuant to a judicial warrant issued by a neutral and detached magistrate after finding probable cause," *McArthur*, 531 U.S. 326, 330-31 (internal quotation marks omitted), we hold that a reasonable officer in Smith's position would have understood that his warrantless seizure of Skove's sign without an arrest and without exigency offended the guarantees of the Fourth Amendment. We therefore

reverse the district court's grant of qualified immunity to Smith on Skove's Fourth Amendment claim.[74]

[26] As for Skove's First Amendment claim against Smith, we determine that the district court properly granted summary judgment to Smith. To prevail on his First Amendment claim, Skove must provide evidence showing that Smith "deterred or chilled [Skove's] political speech and such deterrence was a substantial or motivating factor in [Smith's] conduct." *Sloman v. Tadlock*, 21 F.3d 1462, 1469 (9th Cir. 1994). Smith testified in deposition that he approached Skove and seized Skove's sign because Skove was engaged in protest, an activity Smith knew to be prohibited by Order No. 3. Skove submitted no evidence to the district court to establish that Smith's actions were motivated by opposition to Skove's political beliefs or that Smith's actions were motivated by a desire to chill Skove's speech. Viewing the evidence in the light most favorable to Skove, we conclude that the district court properly granted summary judgment to Smith on Skove's First Amendment claim, and we affirm the district court on this issue.

---

[74]Skove contends that he is entitled not only to reversal of the summary judgment given Smith, but also to a grant of summary judgment establishing Smith's liability for the seizure of Skove's sign. On this requested summary relief for Skove, we view the evidence in the light most favorable to Smith, rather than as we have viewed it above most favorably to Skove. Smith testified by declaration that when he seized Skove's sign he intended to "detain Mr. Skove to determine whether he was authorized to be in the zone." Smith also said in his declaration that "[g]iven the nature and extent of the protests in the area and my assignment, I decided not to pursue Mr. Skove to detain him or arrest him for violating [Order No. 3] and ignoring my directives." Viewing the evidence in the light favorable to Smith, we conclude that there are genuine issues of material fact whether the circumstances at the time and place of the seizure showed sufficient exigency to justify warrantless seizure. *See, e.g.*, *McConnery*, 728 F.2d at 1199. The factual issue of exigency must be presented to a trier of fact.

**E**

We reverse the district court's grant of summary judgment to the City on Menotti's Fourth Amendment and false arrest claims and remand those claims for trial. We also reverse the district court's grant of qualified immunity to Officer Smith, and remand for trial the issue of Smith's liability for the seizure of Skove's sign. We affirm the district court's dismissal of all other claims asserted by Menotti, Sellman, Stedl, and Skove.

**V**

Justice Stewart once observed for the Supreme Court, in no uncertain terms, that "[t]he guarantees of the First Amendment have never meant that people who want to propagandize protests or views have a constitutional right to do so whenever and however and wherever they please." *Greer v. Spock*, 424 U.S. 828, 836 (1976) (quoting *Adderley v. Florida*, 385 U.S. 39, 47-48 (1966)).[75] When a city is charged with the critically important responsibility of hosting a convention of world leaders, a setting in which the eyes of the world are on the city and our country, and our nation's reputation is at stake as well, the city must have the power to maintain civic order in a responsible way that does not unduly interfere with the gathered convention or with civil liberties. In balancing desired freedom of expression and the need for civic order, to accommodate both of these essential values, a measure of discretion necessarily must be permitted to a city, on the scene with direct knowledge, to fashion remedies to restore order once lost. It may be that a violent subset of protestors who disrupt civic order will by their actions impair the scope and manner of how law-abiding protestors are able to present their views.

---

[75]Justice Stewart's quoted observation was made in the context of the Court's decision restricting protest on a military base. The same idea, however, animates the permissibility of reasonable time, place, and manner restrictions on protest in a public forum.

Given the breakdown of public order that confronted Seattle, we decline to hold unconstitutional the City's implementation of procedures necessary to restore safety and security to its residents and to the visiting world leaders. As occurred in this case, a city hosting an important meeting may be besieged with tens of thousands of persons, some with lawful intentions in the best tradition of civic protest, but others with violent and disruptive aims. When violent protestors substantially disrupt civic order, there must necessarily be consequences for all if a city is to satisfy its superordinate duty to provide safety and security. While respecting the liberty of protestors, a city must be permitted to act reasonably, within the bounds of the Constitution, to fulfill its responsibilities of providing physical security and the maintenance of order that is required for all of a city's residents and visitors.

We reject the facial challenges to Order No. 3, as well as the general challenge to police discretion implementing it under the Operations Order. In most respects, and particularly in regard to the permissibility of the City's adoption of Order No. 3 and its accompanying Operations Order, we affirm the judgment of the district court. However, as explained above, viewing the evidence in the light most favorable to Appellants, in some instances police conduct may have gone too far and infringed certain individual protestors' constitutional rights by making the content of their expressed views the test for their entry into the restricted zone. We reverse and remand to the district court the Hankin plaintiffs' as-applied challenge to Order No. 3, as well as the issue of class certification. We also reverse and remand to the district court identified issues regarding the arrest of Menotti and the seizure of Skove's personal property. On the record before us, we conclude that trial of disputed facts is necessary on the claims for which we reverse and remand.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Appendix A (graphic omitted)

Appendix B (graphic omitted)

PAEZ, Circuit Judge, concurring and dissenting:

I concur in the majority's holding that Seattle's Civil Emergency Order Number 3 (Order No. 3) was content-neutral and served a significant government interest. I cannot agree, however, that Order No. 3 was narrowly tailored and left open ample alternative channels of communication. I also disagree with the majority's determination that Order No. 3 provided adequate guidance to the law enforcement officers who were assigned the task of maintaining the perimeter of the "No Protest Zone."[1] Accordingly, I respectfully dissent from Parts III.A.2-3 and III.B of the majority's opinion.

Assuming that Order No. 3 had been a valid time, place, and manner restriction on protected speech, I agree with the majority that the *Hankin* class action plaintiffs have raised material triable issues of fact regarding their claim that City officials enforced Order No. 3 to suppress the First Amendment speech of those individuals who sought to protest the World Trade Organization's policies. The *Hankin* class action plaintiffs should be permitted to proceed with their challenge to the Order as applied, and I therefore concur in Part III.C. of the majority opinion.[2]

---

[1]According to Assistant Seattle Police Chief Harvey Ferguson, "that was the term that was being used" until "word came out . . . that was an inappropriate term" and the name was changed to "restricted zone." As I explain in Part I.B., below, the City's policy was to keep this area protest-free. City officials, police, and demonstrators all used the term "No Protest Zone" to refer to the area, and therefore I use that term throughout this dissenting opinion.

[2]Because I would hold that Order No. 3 is constitutionally invalid, I would reverse the district court's adverse ruling as to Thomas Sellman and remand for further proceedings. I therefore dissent from Part IV.B. As I explain in more detail in Part III, *infra*, I concur in Parts IV.A and D of the majority opinion that Victor Menotti and Doug Skove have presented sufficient evidence to create material factual disputes for trial. I dissent, however from Part IV.C, affirming the summary judgment ruling against Todd Stedl.

The heart of my disagreement with the majority is its conclusion that Order No. 3 was narrowly tailored, that it left ample alternative avenues of expression and that, as implemented, it gave sufficient guidance to law enforcement officers to determine who could be admitted into the No Protest Zone. The majority concludes that the City's ban on all expressive activity in the 25 square blocks surrounding the WTO convention and hotels that housed WTO delegates passes our searching First Amendment review. I cannot agree, and in my view that conclusion is inconsistent with our long tradition of protecting free speech even when that protection may seem inconvenient.

The majority is correct that our inquiry into the content neutrality of Order No. 3 focuses only on the face of the Order itself. But in evaluating whether Order No. 3 is narrowly tailored and leaves open ample alternative avenues of expression, we look deeper than the text. Instead, "we must consider the [City]'s authoritative constructions of the ordinance, *including its own implementation* and interpretation of it." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 132 (1992) (emphasis added). While the text of Order No. 3 may be content neutral, the City's policy was to apply the law selectively such that it was not narrowly tailored to serve its asserted non-speech-related interest of preserving safety and order. As the Seattle City Council put it, "while [Order No. 3] might have met legal scrutiny on paper, [it] resulted in actions that were explicitly intended to limit protest." Report of the WTO Accountability Review Committee, Seattle City Council, at 5 (Sept. 14, 2000) (hereinafter "ARC Report").

## I.  Facts

### A.

The picture painted in the majority's version of the events surrounding the WTO convention in Seattle fails to capture the full story. I agree with the majority that the violent prote-

stors created a dangerous, even chaotic situation in Seattle that warranted substantial responsive measures by the City to restore order. The City surely had a significant interest in taking remedial action. Even in light of the serious violence, however, the City's response—cordoning off a 25-square-block area of downtown Seattle to restrict all forms of protest —was not constitutionally justified.[3] The majority opinion omits several crucial facts that undermine its portrayal of a city in crisis. First, contrary to the majority's assumption, Order No. 3 was not justified by "the dire facts confronting the City in the early morning hours of December 1 during the WTO conference." *Slip op.* at 5990. As Assistant Seattle Police Chief Edward Joiner's deposition testimony made clear, the decision to declare a state of emergency and to impose the police perimeter around the downtown area was *not* made in direct response to the violence and vandalism. That decision instead followed the realization that many of the peaceful protestors from the large, well-organized labor march would not be leaving Seattle. The crowd was simply larger than the police had anticipated. Joiner testified that

> [a]s the march concluded and it became evident that a sizeable portion of the marchers were not going to leave the downtown area as we anticipated and it became clear that we were not going to be able to bring the situation under control without taking some sort of drastic action, I made the decision that the only—the only recourse we had was to establish the police perimeter where we could provide security for the delegates and so forth.

---

[3]The majority states that "[t]he whole world witnessed the rampant violence and chaos in the streets of Seattle at the outset of the WTO meeting." *Slip op.* at 5956 n.7. But as the Seattle City Council suggested, those images may not have accurately reflected the situation in Seattle, as peaceful political demonstrators "were drowned out by press coverage of disturbances." ARC Report at 4.

Making the decision to impose the police perimeter, the City drew no distinction between peaceful protestors and those likely to cause violence—Joiner, for example, testified that during this process, the concept of peaceful and non-peaceful protestors "merged."

Second, although I do not suggest that the violence confronting the City was insignificant, the majority's account exaggerates its pervasiveness. The ARC Report, for example, noted that even according to the highest estimates, only "well under one percent" of the demonstrators in Seattle engaged in acts of vandalism or violence. ARC Report at 3. Mayor Paul Schell agreed that he had "expected the vast majority of the protestors to be peaceful, and, in fact, it turned out that the vast majority of protesters were peaceful." At a press conference at approximately 5:00 p.m. on November 30, Mayor Schell maintained that the protestors for the most part "were friendly—they were our sons and daughters, they were our neighbors, they were the people who we work with. And there's no reason to be afraid of them." The peaceful protestors even made efforts to prevent the violence by, for example, blocking vandals from access to store windows they attempted to break.

Further, the majority does not paint a clear picture of the situation confronting City officials at the time they adopted the Order. The violence of November 30 had ended before Order No. 3 was implemented. The nighttime curfew—not challenged here—had gone into effect and the streets of downtown Seattle were calm and under control. On Tuesday night, at roughly 8:00 pm, the police did a sweep of the streets and, according to Joiner's testimony, discovered that "[a]t that time all of the demonstrators had left. The situation was under control. It was quite peaceful."[4]

---

[4]The majority's warning that "[e]ven a fierce battle may experience a respite of calm, and the calm of an evening can precede a storm in the morning[,]" *slip op.* at 5976 n.33, is alarmism supported by neither the

As the violence on November 30 erupted, the police responded with force that, as the City Council's report concluded, likely intensified the situation. "As authorities lost control of the streets they resorted to methods that sometimes compromised the civil rights of citizens *and often provoked further disturbance.*" ARC Report at 3. The police response "was sometimes out of proportion to the threats faced" and included "seemingly gratuitous assaults on civilians." *Id.* at 4. Plaintiffs' expert Robert Klotz, the former Commander of the Special Operations and Traffic Division in the Washington, D.C. police force, concluded that "the state of emergency declared on November 30, 1999 was to a large extent an emergency of the City's own making." Klotz continued,

> Being seen and heard is why demonstrators come to the event, and if they feel they are barred from doing so, it will simply make the crowd angry and more dangerous. It also makes the police the object of dissatisfaction, rather than the original source of protest. It can also motivate some people to protest police activity who never wanted to be involved originally.

evidence nor the law. The fact that violence had ended and Seattle's streets were calm when the Mayor issued the Order is undisputed in the record. Nonetheless, the majority provides the City "reason to believe . . . that the violence attendant to the WTO conference had not ended prior to Order No. 3's enactment, but had just temporarily subsided and would resume contemporaneous with WTO proceedings." *Id.* at 45 n.44. At the summary judgment stage, however, we must view the evidence in the light most favorable to the nonmoving party. *Balint v. Carson City*, 180 F.3d 1047, 1054 (9th Cir. 1999) (en banc). Only by viewing the evidence in the light most favorable to the *City* can the majority conclude that the violence had "temporarily subsided." With this improper factual determination, the majority sidesteps binding circuit law, which holds that "the occurrence of limited violence and disorder on one day is not a justification for banning all demonstrations, peaceful and otherwise, on the immediately following day (or for an indefinite period thereafter)." *Collins v. Jordan*, 110 F.3d 1363, 1372 (9th Cir. 1997).

One consequence "was to bring sleepy residents out of their homes and mobilize them as 'resistors.' " ARC Report at 11.

City officials were apprised of the large number of protestors planning on coming to Seattle well in advance of the conference. Klotz stated in his declaration that "[t]he preconference estimates of the size of the crowds were generally consistent with the number of people who actually attended." At a police training on demonstration management and crowd control that Seattle Police Captain Jim Pugel attended in July 1999, officials "said on a scale of 1 to 10 the WTO rated about a high 8." Furthermore, the violence that occurred in the weeks leading up to the conference should have put the City on notice that they would need to plan well for the event. *See slip op.* at 5955-56. According to Captain Pugel's own After Action Report, police officials were aware by at least November 28—if not earlier—that protest groups were "intent on facilitating between 500 and 1,500 'civil disobedience' arrests" on November 30. They also knew at that time that they had insufficient resources and "that we might not be able to sustain the arrest of so many persons." There should have been no surprises.

According to the ARC Report, however, "[p]lanning for the WTO was driven by political and cost considerations that undermined the city's ability to cope with the disorders that ensued." ARC Report at 8. The Report found that the "city government failed its citizens through careless and naive planning, poor communication of its plans and procedures, confused and indecisive police leadership, and imposition of civil emergency measures in questionable ways." *Id.* at 3. Klotz similarly concluded that the City "did not adequately plan or train for the WTO conference," focusing its attention on highly unlikely events rather than "events that were, according to the available intelligence, quite likely to occur (i.e., organized civil disobedience and some vandalism)."

**B.**

The manner in which the City implemented Order No. 3 is also worthy of more searching inquiry than the majority affords. The plaintiffs submitted a great deal of evidence to undermine the City's claim that Order No. 3 was necessary to contain and prevent the violence of November 30. Notably, the Order allowed anyone who did not visibly display opposition to the WTO to enter the zone, without regard to dangerousness or likelihood of violence. While the police scoured for "No WTO" signs and buttons, there was no evidence that officers checked bags for crowbars, weapons, or bombs. Lauren Holloway, for example, stated in her declaration that the officers she encountered at the perimeter "did not search me for weapons or ask for ID. They were only interested in our signs and stickers, which they either confiscated or forced us to remove." Andrew Russell recounted a similar experience in his declaration. But this "selective or partial" No Protest Zone did not serve the City's safety and security interests, as Klotz explained:

> [I]t does not serve security goals to have a supposedly secure area where a very large number of inessential people are allowed to enter and roam at will. By giving a free pass to people who claimed to live, work, or even shop at locations within the zone, the City's orders allowed a very large number of people into this supposedly secure area. . . . Serious terrorists or other people bent on breaking the law will have no trouble taking off their anti-WTO stickers at the boundary and pursue their plans once inside the zone.

The plaintiffs also presented significant evidence that even as members of the general public were permitted entry, protestors were turned away from the No Protest Zone. Police Chief Norman Stamper testified that, under the Operations Order that implemented Order No. 3, "a reasonable purpose

does not include coming into the area for protests, so I think the language itself gives rise to the claim that this had become a no-protest zone." At least as late as Friday, December 3, official documents referred to the area as the " 'No protest' zone." Seattle Police Officer Christopher Myers in his deposition testimony referred to it as "the protest zone. There was where protesters were allowed. There was where protesters weren't allowed." And testimony from several protestors reveals that police officers guarding the perimeter used the term "No Protest Zone" when speaking with the public.

Stamper clarified in his deposition that "[f]rom [the line officers'] point of view it effectively meant anybody coming in to protest" would be excluded from the zone. Joiner testified that City officials even considered the idea of allowing in peaceful demonstrators but rejected it, "because I think at that time it had been made very clear there were not going to be peaceful demonstrations within that area." If a person attempting to enter the zone did so, not for the purpose of shopping, but instead intended, individually, to peacefully protest, "she would not have been allowed in."

According to the City Council's report, "officers in the field were briefed with instructions that there would be no protests allowed." ARC Report at 15. Seattle Police Officer Ron Smith testified that, according to "the briefing [he] was given," protesting was not a legitimate reason to enter the zone. The State Patrol, one of the cooperating law enforcement agencies, made that policy explicit: its response plan for December 1 stated that "[o]nly people with legitimate business will be allowed to enter, (working in the area, live, etc.) [sic]. Obvious protesters, people without legitimate business, or people that refuse to give information will not be allowed in the area." In a televised public address, Joiner warned, "Anyone that goes into that area to protest will be arrested immediately."

Even those who should have been granted access to the zone according to the plain terms of the Order, such as people

who lived or worked in the zone, were denied entry if they wore "No WTO" stickers or carried protest signs. Officer Smith testified that the policy as conveyed to him by the Mayor was that "[e]ven if you live there, you are not supposed to be protesting" because "the protest area is down south of Seneca and west the Fourth [sic]. That's what the Mayor said." The plaintiffs offered numerous examples of Seattle police enforcing just such a policy. Michael Louis Evanson, for example, stated in his declaration that while on his way to a tuxedo fitting on 4th Avenue, he was stopped by police officers who snatched his hat and ripped off a sticker that read: "WTO: If it doesn't work for working families, it doesn't work." An officer also reached under Evanson's poncho without permission, grabbed papers he was holding and would not return them. The papers were invitations to a party at the Methodist Church that had nothing to do with the protest.

Martha Ehman, an attorney who worked within the zone, declared that she passed through the perimeter by following the same route she normally took to walk to work every day. She saw three people in business suits pass through the perimeter without being stopped, but she was dressed casually and officers asked her where she was going. They let her pass when she told them where she worked, but as she walked away the officers yelled for her to stop when they noticed that the words "No WTO" were written in masking tape on her backpack. They asked her to remove it and she refused; they then informed her if she did not remove the tape she would be arrested. To avoid arrest, Ehman did as the officers instructed.

Ronald Matyjas also worked downtown, at his architect office just north of the Pike Place Market. He stated in his declaration that on December 1, he wore his typical work attire "with one difference: I had a[n 8.5 x 11"] sign attached to the back of my raincoat that said "No WTO." As he was walking to work, he attempted to pass through the perimeter

but he was stopped by an officer who asked him why he was walking through the area. Matyjas replied that he was on his way to work. The officer told him he could not go downtown with that sign on his coat; another officer tore the sign off without Matyjas's permission. Matyjas noted that "[t]he other officers standing nearby did nothing to stop or correct the officers that confronted [him]."

Ehman, Matyjas, and Andrew Russell all stated in their declarations that once they took off their political signs, for the remainder of the week they were not stopped by police. They were *only* stopped for wearing political messages.

Michael W. Gendler, another Seattle attorney, was a partner at a law office located on the edge of the zone at Fourth Avenue and Pike Street. He declared that he and three of his employees left their office carrying three protest signs which read, respectively, "Downtown Workers Against the WTO," "Protect Free Speech!," and "Say No to WTO" with the words "No Sale" imposed over a picture of the globe. When they attempted to enter the zone, police stopped them and refused entry even after Gendler showed the officers his business card and address. Gendler cited Order No. 3 and told the officer that he had a right to enter because he was an "owner of a business within the limited curfew area." The group was not allowed to enter. Gendler then got rid of his sign and the group walked one block further to another entrance, where Gendler (no longer displaying any anti-WTO messages) simply walked through the perimeter "without being stopped or questioned by any of the officers." His employees, however, still held their signs and they were stopped by officers who told them "they would not be allowed to proceed because they were attempting to enter a 'no protest zone.' " They again displayed their business cards and again were denied entry. "Both were informed that they could proceed without their signs, but not with them." They abandoned their signs and proceeded to enter the zone.

In many other cases, police officers simply made no attempt to determine whether or not an individual was authorized to enter the zone once they spotted any anti-WTO protest material. Andrew Russell, for example, was stopped by an officer as he attempted to enter the zone wearing a "No WTO" button. An officer told him that he could not wear his button inside the "No Protest Zone. He used that specific term." Russell was allowed to enter the zone and keep the button only after removing it from his clothes and putting the button away.

Liad Kantorowicz and her friend Lauren Holloway were stopped by the police at the perimeter. Kantorowicz held a sign and wore three stickers; two "No WTO" stickers and one sticker on her chest which read, "Attention Police Enforcement Officer, I refuse . . . to speak to you. I demand to have my phone call. I demand to call a lawyer." The sticker also included phone numbers of lawyers. An officer noticed Kantorowicz's sign and asked to take it away. When she refused to give it to the officer, Kantorowicz recounted,

> he just grabbed the sign from me and took it, threw it over his shoulder. And I said, "Can I have my sign back? It's my property." Maybe at that point he said, "No. This is a no-protest zone."

An officer then grabbed Kantorowicz and removed the stickers from her clothing.

Holloway carried a sign that read, "It's Our Duty, It's Our Right, To Fight the Power." She also wore stickers with various WTO-related slogans. When she approached the perimeter, officers grabbed her sign, crumpled it up, and threw it away behind a line of police. They told her and Kantorowicz that they were in the "No Protest Zone" and that they would have to take off every anti-WTO sticker or they would be arrested. When an officer grabbed Holloway's arm, she told

him she would remove the stickers herself "[t]o get him to leave me alone."

Sue Bastian, a schoolteacher who traveled to downtown Seattle for the WTO protests, recounted, "I was just a little old lady on my way to the Methodist church carrying these signs in a bag, and I was simply walking down the street on my way to the church." In a bag, she carried one sign that read "Free Trade is Slave Trade" and another that read "Global Cops for Global Corps." She was outside the police perimeter and she did not believe that she was within the zone established by Order No. 3. Nonetheless, she stated in her declaration that a police officer approached her and blocked her passage,

> and then I was surrounded by four or five others. One of them—or somebody took my WTO sticker off my rain jacket. The sticker was underneath my backback. And one of the police took my signs away from me and looked at them and handed them to another policeman, who took them over onto the sidewalk and broke them.

The officers told her she was not allowed in the zone, refused to return her signs and told her "if you don't be quiet and leave, I will have you arrested."

Rita Herkel had a similar experience on her way to the Methodist Church. At the northeast corner of Fourth and Spring, Herkel and her friends were waiting for the light to change so they could cross the street when three police officers approached them. Herkel and her friends were wearing lime green stickers approximately 3 x 5″ that read "No to WTO." The officers said, "You're not allowed to wear stickers," and began tearing the stickers off of Herkel's clothes without permission. They searched her friend's backpack, also without permission, but did not say what they were look-

ing for. While forcibly removing the stickers from another woman in the group, the officers tore her coat.

Harold Green, an attorney in Seattle, heard on television that a "no protest zone" had been established downtown. As he stated in his declaration, "[t]hat struck me as an unconstitutionally broad edict, so I determined to learn from personal experience what the scope of the edict was." He wrote the words "I PROTEST!" on the back of one of his business cards and, wearing a suit and tie, approached an officer at the perimeter and

> asked politely, "If I ask you a question, will I be subject to arrest?" He said that I would not. I then pulled my business card from my pocket, showed him the side which said "I PROTEST!," and asked him, "If I were to cross this line and display this card, would I be subject to arrest?"
>
> He immediately responded that I was subject to arrest at that moment. I then asked him, "Am I in a zone where what I am doing is illegal?," and he repeated that I would be arrested if I did not leave.
>
> I was immediately confronted by two or three other riot police officers with visored helmets and long night sticks who began to shout repeatedly at me, "Go!", "Just Go!" . . . As I did not want to be arrested, I put the card back in my pocket and walked back down (west) Spring Street.

Plaintiff Doug Skove similarly went downtown to protest after hearing a news broadcast describe the zone as a "no protest zone." He went inside the zone carrying a sign that said "I have the right to protest non-violently." Skove testified at his deposition that Officer Ron Smith grabbed the sign out of his hand without Skove's permission, saying "I'm going to take that" before any other communication between the two.

Smith told him to come over but Skove instead walked away and was not pursued. This incident was captured on videotape.[5] Officer Smith never ascertained whether Skove was authorized by the Operations Order to be within the zone before tearing the sign away from him. Smith testified in deposition that he determined only that Skove "appeared not to belong there" because "[h]e was walking around with a sign." Skove then went to the corner of Fifth Avenue and Pike Street and took out a second sign, where another unidentified officer again took the sign from his hands without permission and without any prior verbal exchange.

Other people were stopped by the police while attempting to more actively protest within the zone, confirming the City policy that protesting was not a "reasonable purpose" within the meaning of the Order. Thomas Sellman, a plaintiff in this appeal, heard on the news that Seattle had adopted a "no protest zone" where people could enter for any reason other than protest. He went downtown "basically to find out what was really meant and whether the broadcasters in some way had accurately described the intent of the Mayor and the City of Seattle." He walked down the sidewalk, within the zone, and distributed leaflets criticizing the WTO's ability to overrule endangered species laws. He was stopped by Detective S.D. Stevens, who determined that Sellman's activity was "obviously" not "legitimate business" within the scope of the Operations Order. Stevens told him he needed to go two blocks south in order to protest. Instead of leaving, Sellman handed one of his flyers to a WTO delegate as he walked by. Stevens then placed Sellman under arrest for failure to disperse.

---

[5]The videotape shows Smith approaching Skove and asking, "What did the Mayor tell you? Okay? Other side of Fourth, other side of Seneca, right?" Smith then ran toward Skove, who was crossing the street, and grabbed his sign out of his hands. As previously noted, however, on the City's motion for summary judgment, we take the evidence in the light most favorable to the plaintiffs and therefore credit Skove's recollection of the event. *Balint*, 180 F.3d at 1054.

Plaintiff Todd Stedl went to the zone to hand out copies of the First Amendment; if an officer stopped him he "planned on saying 'I'm not protesting; I'm educating.' " Stedl testified at his deposition that the officer who first stopped him at Fourth Avenue and Seneca Street reacted by saying, " 'not with this you're not,' and he grabbed the fliers that I was holding on to and then proceeded to dig into the bag where I had the remaining fliers. . . . As he reached into the cloth sack, I said, 'you need a search warrant to take those.' . . . He said, I believe—he said something to the effect of, 'no, I don't.' " His remaining fliers were seized but Stedl was not arrested. When Stedl asked the officer for his badge number, he was told to "get going." He then left and continued to protest only outside of the zone. Stedl testified that "I was intimidated to the point that I felt that if I had returned to the no protest zone to hand out the First Amendment, that I would most likely get arrested, yeah, and that was not my intent . . . ."

After many months of investigation, the Seattle City Council concluded that "Seattle was not sufficiently mindful . . . of the need to create an environment protecting the rights to speech and assembly." ARC Report at 5. The City's policies in implementing Order No. 3 targeted expressive activity but did not seek to distinguish between violent and non-violent protestors or to better-tailor the fit between Seattle's security problems and a legitimate solution.

## II.   Restrictions on Time, Place, and Manner of Speech

### A.   Narrow Tailoring

If a regulation restricting speech in a public forum is content neutral, our standard for determining whether it is narrowly tailored is more relaxed. *Perry Education Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983). The policy adopted "need not be the least restrictive or least intrusive means" available to survive this intermediate level of

constitutional scrutiny. *Ward v. Rock Against Racism*, 491 U.S. 781, 798 (1989). But a government entity is not free to adopt any regulation that serves its interests more effectively than no regulation at all; a restriction may not burden "substantially more speech" than necessary to further the government interest at stake. *Id.* at 799; *see also Kuba v. 1-A Agricultural Ass'n*, 387 F.3d 850, 861 (9th Cir. 2004). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby v. Schultz*, 487 U.S. 474, 485 (1988)*; see also Ward*, 491 U.S. at 799 ("Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals."). This is so even if the rule is completely effective in eliminating the targeted evil. *Id.* at 799 n.7.

The 25 square blocks of downtown Seattle cordoned off by Order No. 3 were plainly a public forum; indeed, city streets are "quintessential public forums" which " 'have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.' " *Perry Education Ass'n*, 460 U.S. at 45 (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)); *see also ACLU of Nevada v. City of Las Vegas*, 333 F.3d 1092, 1099 (9th Cir. 2003). "No particularized inquiry into the precise nature of a specific street is necessary; all public streets are held in the public trust and are properly considered traditional public fora." *Frisby*, 487 U.S. at 481.

Our inquiry into whether Order No. 3 was narrowly tailored should begin by analyzing the government's asserted interests in responding to the violence confronting Seattle on November 30. *See Kuba*, 387 F.3d at 858. Without doubt, a city has a significant interest in preserving the safety of its residents and visitors, and in preventing violence and vandalism on city streets.[6] *See, e.g.*, *Perry v. Los Angeles Police Dep't*, 121 F.3d

---

[6]The majority's assessment of the City's significant interests is confused and inconsistent, and changes subtly depending upon the argument

1365, 1369 (9th Cir. 1997) ("Government interests in promoting public safety and the orderly movement of pedestrians, and in protecting the local merchant economy are . . . substantial."). A city cannot, however, use a concededly-legitimate interest in "security" to justify a rule drawn as broadly as it wishes. *See Bl(a)ck Tea Soc'y v. City of Boston*, 378 F.3d 8, 13 (1st Cir. 2004) ("Security is not a talisman that the government may invoke to justify *any* burden on speech (no matter how oppressive)." (emphasis in original)). Here, Klotz's dec-

---

the majority seeks to bolster. At times, the majority cites "the core interest" as protecting the president and foreign dignitaries. *See slip op.* at 5980-81 n.41. But it also claims that the City's interest was in "maintaining public order," *id.* at 5975, "providing security to the core downtown area," *id.* at 5975 n.32, and "seeing that the WTO delegates had the opportunity to conduct their business," *id.* at 5976.

In my view, the City had a significant interest in protecting the public safety. That broad interest required that the City protect the public (including President Clinton and foreign dignitaries) both inside and outside the No Protest Zone, and provide safe transport for delegates to and from the convention. Order No. 3 helped serve those interests, but it was a sledgehammer solution where a more tailored response would have preserved First Amendment protections. Moreover, the City did not have a constitutionally significant interest in sheltering delegates from the unpleasantness or inconvenience of a large demonstration. The Order itself was justified by a need "to protect the public peace, safety, and welfare" and to preserve the safety of "delegates, dignitaries, citizens, public safety employees and protestors" alike.

The City now argues, relying on *Hill v. Colorado*, 530 U.S. 703, 718 (2000), that it had a significant interest in protecting the delegates' "right to be left alone." In *Hill*, the Supreme Court upheld a law that prohibited any person from knowingly approaching within 8 feet of another person to protest, within designated areas near medical facilities. *Id*. But in *Kuba*, we clarified that *Hill* "did not 'protect a potential listener from hearing a particular message,' but only 'from the potential physical and emotional harm suffered when an unwelcome individual delivers a message by physically approaching an individual at close range.' " 387 F.3d at 861 n.10 (quoting *Hill*, 530 U.S. at 718-19 n.25). As in *Kuba*, the audience here was not "particularly vulnerable," *id.*, and therefore did not need "to be left alone."

laration suggests, "[t]he City's goal should have been to transport the delegates to the conference, not necessarily to protect a particular method of getting them to the conference (walking individually, without any designated route)." Viewing the City's interest in this broader context,[7] it becomes clear that such a sweeping prohibition on speech as Order No. 3 imposed was not justified.[8]

Like a hypothetical ban on handbilling, *see Ward*, 491 U.S. at 799 n.7, Seattle's ban on all protesting within a large area of downtown Seattle might have effectively quelled violence and improved safety. Nonetheless, because it "burden[ed] substantially more speech than [was] necessary to further the government's legitimate interests[,]" *Kuba*, 387 F.3d at 861, Order No. 3 was not narrowly tailored. The City's solution was a poor fit in several respects.

First, Order No. 3 was geographically larger than justified.[9]

---

[7]The majority mischaracterizes my assessment of the City's interest as one more narrow than the situation required. *Slip op.* at 5975-76 n.33. That is inaccurate. The City's significant interest in safely transporting delegates to the convention sites is certainly broader than the interest Order No. 3 actually served: "to protect a *particular method* of getting [delegates] to the conference . . . ." The vast size of the zone was only crucial to that more narrow interest. *C.f. slip op.* at 5979. The majority recognizes that the City had an interest in "ensuring safe transit for delegates between venues and hotels," *id.*, but offers no convincing rationale for rejecting the plaintiffs' less-restrictive alternatives.

[8]The majority further maintains that "[t]he City also had an interest in seeing that the WTO delegates had the opportunity to conduct their business at the chosen venue for the conference; a city that failed to achieve this interest would not soon have the chance to host another important international meeting." *Slip op.* at 5975-76. I am not convinced that a city's interest in hosting such an event is "significant" for purposes of this analysis. Because it is not asserted as an interest on appeal, we should not provide this justification for the City.

[9]Order No. 3 also lasted longer than necessary. The City had the right to "act vigorously, and more extensively, to restore order," *slip op.* at 5985, but as noted above, order *already* had been restored. *See supra* at

Protestors were banned from a 25-square-block area of down-town Seattle that purposely encompassed every place they could hope to communicate to delegates.[10] Mayor Schell testi-fied in his deposition that he never scrutinized or questioned why the zone needed to be that large—simply, "the concept was to enclose all of the delegate hotels." But as Klotz pointed out, the size of the No Protest Zone actually impeded law enforcement anywhere other than the perimeter, since "[i]t takes more officers to secure a larger space than a smal-ler one." The majority cites no case in which a court has upheld a similarly-large prohibition; in fact, we have struck down restricted zones of much smaller scale.[11]

Second, the Order banned *all* protesting without regard to the likelihood that it would lead to violence or disorder. Not only that, but any individual intent on causing harm could easily enter the zone simply by asserting that he or she fell within one of the Operations Order's exceptions. Order No. 3 banned peaceful expressive activity without regard to the City's stated safety-related goals. The majority concludes that

6027-28 & n.4. The Mayor signed Order No. 3 in the early morning hours of December 1, long after both violence and protest activity had subsided. *See slip op.* at 5962. Again, as we stated in *Collins*, 110 F.3d at 1372, "the occurrence of limited violence and disorder on one day is not a justifica-tion for banning all demonstrations, peaceful and otherwise, on the imme-diately following day (or for an indefinite period thereafter)."

[10]The size of the No Protest Zone was reduced considerably on Decem-ber 2. The new zone excluded the Westin Hotel after President Bill Clin-ton departed Seattle. *Slip op.* at 5967, *see also* Appendix B.

[11]*See*, *e.g.*, *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1227 (9th Cir. 1990) (holding that a 75-yard buffer zone surrounding naval ships in a parade, which the city claimed served its interest in safety and security, was too large and a 25-yard zone would serve that interest just as effectively); *United States v. Baugh*, 187 F.3d 1037, 1044 (9th Cir. 1999) (holding that a 150 to 175-yard restriction on protestors from the entrance of a visitor center was too far); *Kuba*, 387 F.3d at 862 (holding that a policy "which relegates communication activity to three small, fairly peripheral areas" was too broad in relation to the government's interest).

it would have been too burdensome to require police to make case-by-case distinctions between "those protestors with benign intentions and those with violent intentions." *Slip op.* at 5980 (citing *Hill*, 530 U.S. at 729). This case is significantly different from *Hill*: the police established a perimeter around the No Protest Zone precisely so they could make case-by-case determinations as to who would be allowed in the restricted area. The majority would allow the police to search people they suspected of carrying stickers and handbills, but concludes that it "would not have been practical" for police to search for crowbars or spray paint. *Id.* at 5982. I see no basis for that conclusion.

In *Collins*, we evaluated a similar emergency order adopted under analogous circumstances.[12] After the verdict was announced in the first Rodney King beating trial, San Francisco found itself amidst a number of demonstrations—both peaceful and violent. 110 F.3d at 1367. Those demonstrations led to "a number of violent incidents," which caused property damage and minor injuries. *Id.* In response, then-Mayor Jordan declared a state of emergency and issued an order, approved by the Board of Supervisors, authorizing the police to disperse any gatherings "anywhere in the City and County

[12]The majority is too quick to dismiss and marginalize *Collins*. By asserting that the violence confronting Seattle was worse than the violence San Francisco faced, the majority concludes that *Collins* is simply "inapposite." *Slip op.* at 5984. But the majority's analysis of *Collins* focuses on the factors it finds favorable and ignores other important distinctions that ought to inform our judgment. For example, the majority characterizes San Francisco's emergency order as "significantly broader," *id.* at 5984 n.45, dismissing the fact that the order was narrowly targeted to apply only to gatherings "likely to endanger persons or property." The circumstances in Seattle were clearly analogous to *Collins* and the majority is far too eager to sidestep binding circuit law.

Moreover, the constitutional narrow tailoring analysis accounts for violence as part of the City's interest weighed against its tailored response. I decline to adopt the majority's approach that allows the legal framework to be shaped and distorted by its characterization of the level of violence.

of San Francisco whenever the peace officer on the scene has reason to believe that the gathering endangers or is likely to endanger persons or property." *Id.* The order was thus specifically targeted to bar only demonstrations that would likely lead to violence. We nonetheless held not only that the order was facially unconstitutional, but that the law was so clearly established than no reasonable officer could believe it would be constitutional. *Id.* at 1374.

In making that determination, we noted that "the proper response to potential and actual violence is for the government to ensure an adequate police presence and to arrest those who actually engage in such conduct, rather than to suppress legitimate First Amendment conduct as a prophylactic measure." *Id.* at 1372. Similarly, in *Baugh*, we noted that "[t]he Park Service, in lieu of restraining the expressive activity by refusing to issue the permit, should have issued the permit for the lawful expressive activity and then arrested the demonstrators if and when they trespassed." 187 F.3d at 1044. The plaintiffs here argue that "police should have had more extensive staffing on the street so that they could permit protestors to enter anywhere and simply arrest and remove those who violated the law." *Slip op.* at 5982. Yet in the face of our clear precedent, the majority asserts "we should hesitate to say that the law requires such a solution" where a city confronts actual lawbreakers. *Id.* at 5982. That hesitation is plainly contrary to our circuit's law.

Third, even those who were *exempt* under the plain terms of the Order were denied entry if they displayed any visible signs, stickers, or messages related to the WTO. The City's policy was clear: protesting was not a "legitimate purpose" for entering the No Protest Zone. This restriction cannot survive constitutional scrutiny. In *Virginia v. Hicks*, the state housing authority similarly attempted to ban "any person" from the streets of a public low-income housing development "when such person is not a resident, employee, or such person cannot demonstrate *a legitimate business or social purpose*

for being on the premises." 539 U.S. 113, 116 (2003) (emphasis in original). Again like here, the policy was enacted "in an effort to combat the rampant crime" that had infected the area. *Id.* at 115. The Supreme Court upheld the policy under the First Amendment only after interpreting "legitimate business" to *include* expressive activity. *Id.* at 122; *see also Hodgkins v. Peterson*, 355 F.3d 1048, 1059 (7th Cir. 2004). Seattle's clear policy of excluding any form of protest from its definition of "legitimate purposes" disregards the primacy we afford such core political speech under the First Amendment.

We considered a similar problem in *Grossman v. City of Portland*, where we invalidated a law forbidding organized demonstrations in a public park without a permit.[13] 33 F.3d 1200, 1203 (9th Cir. 1994). Like Seattle's interpretation of Order No. 3, whether an individual was subject to arrest under the statute depended entirely on whether that individual was displaying a message.

> Consider this: if [the plaintiff] and his companions had been standing in a group in the park after meeting unexpectedly, and had been discussing gardening, or the Portland Trailblazers, the [plaintiff] would not have been arrested. While the addition of signs—or T-shirts, or an 'address'—would have occasioned the application of [the challenged ordinance], the distinctions are absolutely empty in terms of the ordinance's stated goals.

---

[13]Again, the majority dismisses *Grossman* by distinguishing the level of violence facing the City. But the legal framework is not altered by an assessment of the City's interest as more or less important; the extent of the City's interest is accounted for inherently within the narrow tailoring inquiry. *See supra* note 12. Although the facts in *Grossman* clearly differ in certain respects from the facts at issue here, that does not render its reasoning inapplicable to this context. Indeed, where the majority finds it useful to rely on cases involving minimal violence, the majority freely relies on such authority. *See*, *e.g.*, *slip op.* at 5980 (discussing *Hill*, 530 U.S. at 729); *id.* at 5988 (citing *Bl(a)ck Tea Soc'y*, 378 F.3d at 14).

*Id.* at 1207. Order No. 3 operated in exactly the same way, and we should not condone that affront to First Amendment protections.

The majority's conclusion to the contrary is plainly wrong. Finding *Grossman* "inapposite," the majority states that Seattle's "distinction between groups displaying messages and groups not displaying messages" was appropriate because protestors—and "not emergency personnel, business employees, or shoppers"—caused the violence. *Slip op.* at 5895 n.46. The majority, however, overlooks two important points: First, a distinction between protestors and non-protestors was not at the heart of Order No. 3. The Order instead aimed to preserve the public safety by implementing a limited curfew, which would alleviate the disorder and chaos in the downtown area. *See id.* at 18-19 (quoting Order No. 3 pmbl). But the majority is also wrong as a factual matter. People within the zone (*including* employees and shoppers) who simply displayed messages were no more likely to cause violence than those without messages. *See id.* at 15 (describing an incident where a *delegate*, not a protestor, drew a gun against the crowd). Whether or not an individual wore a "No WTO" button should have had no bearing on her treatment by the police.

Fourth, the Order completely disregarded any interest in maintaining peace and security in areas *outside* the zone. While the Order may have served to protect delegates, it did not protect anyone outside of the perimeter. "[P]olice operations . . . should convey a perception of even-handed commitment to protecting demonstrators as well as the larger public[;]" the City's response to the demonstrations in Seattle did not serve that goal. ARC Report at 4. The majority recognizes the poor fit between the City's asserted interests and the means it chose to respond to the violence:

> Even outside the restricted zone, there were some problems of violence incidental to protest. Some violent protestors caused property damage, threw

debris, blocked the street, and trapped people in their cars. Some protestors jumped onto an officer's patrol car and shook it by its light bar, while others laid in front of the car and prevented the officer from escaping. Some protestors took over the fuel pumps at a gas station and attempted to fill small bottles with gasoline.

*Slip op.* at 5966 n.21. The majority acknowledges that a Seattle police captain's report "noted that officers 'heard and saw numerous incidents of property destruction, burglary, and looting; but we were unable to leave our lines to take enforcement actions.' " *Id.* at 5962. The large perimeter created by Order No. 3 could only be maintained by a substantial police presence; its size thereby allowed the violence in areas outside the No Protest Zone to continue. The perimeter in fact served *only* the goal of protecting WTO delegates. It therefore violated *Ward*'s requirement that "[t]he tailoring of the restraint must of course correspond to the purposes it serves." *Id.* at 5974 (citing *Ward*, 491 U.S. at 799).

Finally, and fundamentally, Order No. 3 was not narrowly tailored to the City's interests because, as Klotz put it, "it was sought to pursue the wrong goal . . . ." That is, the Order guaranteed that WTO delegates could walk safely from their hotels to the Convention Center on city sidewalks. But as noted above,[14] the City's significant interest was not so narrow; the City had less-restrictive alternatives available that would have served its interest in safety and security equally well. We have stated that "while the City need not employ the least restrictive alternative in promoting its interest in public safety, 'if there are numerous and obvious less-burdensome alternatives to the restriction on [protected] speech, that is certainly a relevant consideration in determining whether the "fit" between ends and means is reasonable.' " *Edwards v. City of Coeur d'Alene*, 262 F.3d 856, 865 (9th Cir. 2001)

---

[14]*See supra* note 7.

(quoting *City of Cincinnati v. Discovery Network, Inc.*, 507
U.S. 410, 418 n.13 (1993)) (alteration in original). Here, the
plaintiffs suggested several.

The majority concludes that because Seattle's pedestrian
"tunnels . . . did not connect all of the hotels and venues being
used by WTO delegates[,]" the plaintiffs' suggestions were
not "feasible." *Slip op.* at 5979 n.39. Even assuming the
pedestrian tunnels were an inadequate solution, the plaintiffs
in fact suggested various other worthwhile alternatives. First
and foremost, "the City should have developed a plan to
ensure that delegates could get to the convention." As Assis-
tant Police Chief Clark Kimerer explained in his declaration,
the City was aware that "[a]n avowed and announced goal of
some of the protestors was to shut down the WTO conven-
tion, i.e., prevent the delegates from reaching their venues[;]"
therefore, transportation should have been an important part
of the City's response.[15] Klotz suggested, for example,
"planned bus and van service routes or controlled access
routes" for the delegates; instead, "the only transportation
option for delegates was to walk from their various hotels to
[the] Convention Center through routes of their own choos-
ing." Klotz suggested several concrete alternatives:

> A dedicated drive called Convention Way runs
> underneath the Convention Center from approxi-
> mately Ninth and Pike to Seventh and Union. It is
> designed to accommodate tour busses and has an
> easily protected indoor entrance to the facility. . . .
> Thus, one transportation method that should have
> been explored was sending buses from the hotels out

[15]Contrary to the majority's assertion, I do not "attempt to reduce the
City's interest to transporting delegates . . . ." *Slip op.* at 5975 n.32. The
City's interest extended to protecting the public safety broadly. But as this
discussion demonstrates, the measures employed by the City served a
much narrower interest and thus were not narrowly tailored. This list of
alternative measures simply demonstrates that fact.

> to the Interstate, and into the Convention Center through this entrance. This route is indirect, but it avoids almost all protest points.
>
> Another transportation option that I did not see explored is the pedestrian tunnel that runs from the Rainier Square building . . . and exiting only a few yards from a well protected off-street entrance to the Convention Center. Mayor Schell testified in his deposition that he used this route without incident on the afternoon of November 30.

Further, the City could have used "flying squads," or mobile teams without responsibility for maintaining police lines, that could have pursued and arrested vandals and violent protestors. Although the City originally planned on pursuing this strategy, "[w]hen the day arrived, the flying squads were pulled off that duty to join the fixed police lines. As a result, the relatively small number of vandals could destroy property without threat of arrest." Lieutenant Neil Low, who was responsible for deploying flying squads, stated in his internal WTO After Action report that "[i]n concept, we were to work along with Lt. Joe Kessler's plain-clothes squad in locating and arresting hardcore protestors committing criminal acts. In actuality, we became involved in crowd control within one hour of being on the street, continuing with that for the remainder of the week."

"[T]he First Amendment demands that municipalities provide 'tangible evidence' that speech-restrictive regulations are 'necessary' to advance the proffered interest in public safety." *Edwards*, 262 F.3d at 863. As this list of alternative possibilities demonstrates, Order No. 3, as written, was not necessary to advance that interest, nor did the City provide any tangible evidence of such a requirement. The Order was not narrowly tailored and the majority's contrary conclusion disregards these important considerations.

## B.  Ample Alternatives

Not only was Order No. 3 not narrowly tailored to serve the significant government interest in safety and security, it also failed to leave open ample alternative methods of communication. An entire medium of speech was foreclosed and the WTO protestors were silenced and relegated to the sidelines. "If an ordinance effectively prevents a speaker from reaching his intended audience, it fails to leave open ample alternative means of communication." *Id.* at 866 (citing *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654 (1981)); *see also Bay Area Peace Navy*, 914 F.2d at 1229 ("An alternative is not ample if the speaker is not permitted to reach the 'intended audience.' "). Order No. 3 prevented protestors from entering the 25-square block area where WTO delegates could see and hear them. It confined all demonstrations to outside areas where the message the protestors sought to convey may never have reached the intended audience.[16]

In *Bay Area Peace Navy*, we found that a 75-yard security

---

[16]The majority points out that the record is "void of evidence" that protestors could not be seen or heard by delegates within the No Protest Zone. *Slip op.* at 5992 n.54. But neither does the record reflect that the delegates *could* see and hear protestors, or that the alternative means of communication available to the protestors were sufficient. Since it is unclear whether the message could be heard in any recognizable form, at a minimum the plaintiffs have established a genuine issue of material fact such that summary judgment is inappropriate. *Balint*, 180 F.3d at 1054. The majority states that "the undisputed facts in the record show that per the terms of Order No. 3 protestors could communicate their views directly outside most of the hotels where delegates were staying." *Slip op.* at 5992 n.54. I am at a loss to find *any* evidence in the record to support that statement; nothing in the record or in the majority opinion supports the conclusion that protestors could "communicate" anything to delegates within the No Protest Zone. The majority supports its factual assertion by drawing inferences in favor of the City. As previously noted, this is improper at the summary judgment stage. I am not prepared on this limited record to conclude as a matter of law that Order No. 3 left ample alternative avenues of expression.

zone "rendered the [plaintiffs'] . . . demonstration completely ineffective and that passing out pamphlets on land or demonstrating at the entrance to the pier are not viable alternatives because the invited visitors, who are the [plaintiffs'] intended audience, are not accessible from those positions." 914 F.2d at 1229 (quotation marks omitted). And in *Baugh*, we held that forcing demonstrators to an area 150 to 175 yards away from their intended audience "[did] not provide a reasonable alternative means for communication of [the plaintiffs'] views." 187 F.3d at 1044. Because the regulation at issue in *Baugh* was not tailored "narrowly to allow for lawful demonstrations," it did not leave open ample alternative means of communication. *Id.* Similarly, Order No. 3, which forced protestors to the sidelines and back entrances to the WTO conference venues, did not provide viable alternatives.

City officials all but conceded that the avenues of expression left open were insufficient to allow for meaningful communication. Before the conference began, Seattle police negotiated with organized protest groups to set up "established protest areas." As Assistant Chief Joiner testified,

> In establishing those sites we had tried to make sure that they were well located or that they met the needs of the protest groups, that they were visible, that they could see whatever event that they were protesting. In other words, they would be located very close to them. And so we had tried to do everything we could to accommodate peaceful protests on the front side. Obviously that—those agreements broke down on Tuesday morning.

After the agreements broke down and the Mayor issued Order No. 3, Joiner explained that "we had to move people out of that area." In other words, the carefully-crafted protest areas, which would have allowed protestors to see the delegates and be seen by them, were eliminated. Instead, protestors were

relegated to the inaccessible areas where no WTO delegates would be bothered by their presence.

Without citing any authority, the majority concludes that the ample alternatives test should be applied "with a practical recognition of the dire facts confronting the City . . . ." *Slip op.* at 5990. Nowhere in our case law, however, have we even suggested that courts should balance this factor against a city's asserted need to restrict speech. Rather, we require that ample alternative avenues of expression be available in order for a time, place, and manner restriction to withstand First Amendment scrutiny. There is no exception for exigency.

The City asks us to adopt the rule advocated by the Second Circuit in *Bl(a)ck Tea Society*. There, the court noted that demonstrators' messages at "a high-profile event"—the 2004 Democratic National Convention—may reach delegates even if speech is curtailed, "through television, radio, the press, the internet, and other outlets." 378 F.3d at 14. Because the majority concludes that the ample alternatives requirement was met in any event, it does not address this argument. *Slip op.* at 5988 n.49. The district court, however, relied on this argument to conclude that Order No. 3 did not foreclose reasonable alternative avenues of expression. The district court was mistaken and we should dispel any notion that media interest in an event can be a substitute for constitutionally-required alternative avenues of communication. As the Seventh Circuit stated in *Hodgkins*, "there is no internet connection, no telephone call, no television coverage that can compare to attending a political rally in person . . . ." 355 F.3d at 1063. Public protests are at the heart of the First Amendment and are critical for incubating civic engagement and encouraging spirited debate.

We evoked this concern in *Grossman*, 33 F.3d at 1205 n.8, and reiterated the particular importance of preserving parks as forums for public debate precisely because ordinary people lack reliable access to the media. The need to protect the aver-

age citizen's ability to be heard "is increasingly significant now, when the extremely rich have an enormous variety of privately-owned media through which to reach the public . . . . At present, more democratic means of communication— demonstrations in parks, bumper stickers, signs in the windows of homes—must be jealously protected." *Id.* The City would place the demonstrators at the mercy of the media industry. There is no way to guarantee that the message protestors seek to convey would be heard in any recognizable format. The First Amendment cannot allow a city to require that subjugation.

## C. Discretion

Even a content-neutral time, place, and manner restriction will not survive First Amendment scrutiny if it allows for unduly broad discretion on the part of the official charged with enforcing the regulation. Thus, a regulation that restricts speech must "contain adequate standards to guide the official's decision and render it subject to effective judicial review." *Thomas v. Chicago Park District*, 534 U.S. 316, 323 (2002). This rule applies even outside the traditional context of licensing schemes. For example, in *Board of Airport Commissioners v. Jews for Jesus*, the Supreme Court held unconstitutional a city ordinance that prohibited all "First Amendment Activities" at Los Angeles International Airport, even if the law were read to apply only to expressive activity that was not "airport-related." 482 U.S. 569, 575, 576 (1987). The Court refused to validate a law that would

> give LAX officials alone the power to decide in the first instance whether a given activity is airport related. Such a law that confers on police a virtually unrestrained power to arrest and charge persons with a violation of the resolution is unconstitutional because the opportunity for abuse, especially where a statute has received a virtually open-ended interpretation, is self-evident.

*Id.* (quotation marks omitted).

The First Amendment forbids even the *opportunity* for abuse, not just policies that encourage preference for a favored view. *See City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 757 (1988). If that opportunity is present, the regulation " 'creates an unacceptable risk of the suppression of ideas.' " *Kuba*, 387 F.3d at 856 (quoting *Foti v. City of Menlo Park*, 146 F.3d 629 (9th Cir. 1998)). Order No. 3, however, clearly afforded officers the opportunity for abuse, and was therefore constitutionally infirm.[17] According to Mayor Schell's deposition testimony, the decision whether to arrest peaceful, lawful protestors within the zone "would depend on the judgment of the officers and people charged with the responsibility of carrying out that order."

Chief Stamper acknowledged that Order No. 3 and the Operations Order interpreting it were "sufficiently vague that it made it difficult from a working cop's point of view to distinguish between who should and who should not be left out." Stamper himself "honestly [didn't] know the answer" whether peaceful protest was a "reasonable purpose" under the Order.

[17]Relying on *United States v. Griefen*, 200 F.3d 1256, 1263 (9th Cir. 2000), the majority concludes that, because Order No. 3 was a lawful time, place, and manner restriction, the discretion it afforded officers to allow or deny entry into the zone "does not render Order No. 3 constitutionally deficient." *Slip op.* at 5998. *Griefen*, in which we upheld the closure of a construction site to all but essential personnel, is inapposite, as the area into which the plaintiffs sought entry to protest had temporarily lost its status of public forum as a result of the construction activity. 200 F.3d at 1261 ("The immediate area of a construction zone is not an area that has the attributes of a public forum, or even a limited public forum, where people are entitled to exercise their rights of free speech."). The 25-block area in Seattle cordoned off by Order No. 3, on the other hand, affected a quintessentially public forum—city streets and sidewalks—and therefore the Order is subject to a higher degree of scrutiny. *See supra* at 6039; *see also Collins*, 110 F.3d at 1371; *ACLU of Nevada*, 333 F.3d at 1098 ("The ability to restrict speech in public forums . . . is 'sharply circumscribed.' ")."

And Officer Smith testified at his deposition that he and his fellow officers were never given "a laundry list of activities which would be deemed to be legitimate." Instead, he was told simply to apply "what a reasonable person would think legitimate business is." In sum, the plaintiffs presented evidence that individuals with disfavored views—namely, anyone wearing a "No WTO" sticker or button—were systematically excluded from the zone, whether or not the individual should have been allowed entry under an exception to the Order.[18] Furthermore, officers were permitted complete discretion to determine who was a "protestor" and what was a "reasonable purpose," and therefore who would be excluded. The majority's conclusion that "there was no danger on the face of Order No. 3 that officers enforcing the restricted zone could indiscriminately withhold permission to speak," s*lip op.* at 5999, is flatly contrary to the evidence.

The majority concludes that under *Chicago Park District,* the guidelines contained in the Operations Order were sufficiently "specific and objective, and [did] not leave the decision to the whim of the administrator." *Id.* at 6000 (quoting 534 U.S. at 324). But the discretion provided here is quite different—and clearly broader—than the ordinance upheld in *Chicago Park District.* That case involved a licensing scheme that allowed the district to deny a permit

> when the application is incomplete or contains a material falsehood or misrepresentation; when the applicant has damaged Park District property on prior occasions and has not paid for the damage; when a permit has been granted to an earlier applicant for the same time and place; when the intended use would present an unreasonable danger to the health or safety of park users or Park District employees; or when the applicant has violated the terms of a prior permit.

---

[18]*See supra* Part I.

534 U.S. at 324. In light of these highly objective criteria, the Supreme Court held that the disqualifying grounds were "reasonably specific and objective" to defeat a claim of unbridled discretion. *Id.* The Court has never held that a regulation allowing officers to determine unilaterally what constitutes a "reasonable purpose," with no further elaboration on what might be considered "other like type reasonable activity," provides sufficient guidance.[19] Even if Order No. 3 were in fact a reasonable time, place, and manner restriction, it would nonetheless fail to satisfy the First Amendment's requirements foreclosing unbridled discretion in enforcement.[20]

## III.

As for Menotti, Stedl, and Skove's Fourth Amendment claims, I would reverse the district court's grant of summary judgment. I agree that Menotti has presented sufficient evidence to create a material factual dispute whether he impeded pedestrians and whether he obstructed an officer in the perfor-

---

[19]Relying on *S. Oregon Barter Fair v. Jackson County*, 372 F.3d 1128, 1139-41 (9th Cir. 2004), the majority suggests that we have in fact found sufficient guidance in similarly-drafted statutes. *Slip op.* at 5998. But clearly the determination of "a fee reasonably calculated to reimburse the county for its reasonable and necessary costs," *S. Oregon Barter Fair*, 372 F.3d at 1140, vests far less discretion in the enforcement officer than determining what constitutes "other like type reasonable activity." The majority's attempt to equate the two is not persuasive.

[20]While noting the relevant facts, the majority concludes that they give rise only to a challenge to Order No. 3 as applied to particular plaintiffs. *See slip op.* at 5998-6000. The discretion conferred by Order No. 3, however, rendered it facially unconstitutional, *Chicago Park District*, 534 U.S. at 323, and incapable of any valid application. *Kuba*, 387 F.3d at 856. In *Chicago Park District*, the Court limited plaintiffs to an as-applied challenge only *after* determining that the challenged permitting scheme contained "adequate standards to guide the official's decision and render it subject to effective judicial review." 534 U.S. at 323. Because the standards provided police officers to guide enforcement of Order No. 3 were not "reasonably specific and objective," *id.* at 324, the majority incorrectly confines the plaintiffs to an as-applied challenge here. *Slip op.* at 6007-08.

mance of his duties. Whether the police officers had probable cause to arrest Menotti turns on the resolution of these factual issues. *See*, *e.g.*, *United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir. 1994). I would also reverse the district court's summary judgment ruling against Stedl, because there is sufficient evidence in the record to create a genuine factual dispute whether the City had a policy of authorizing unlawful searches and seizures of those who sought to express any opposition to the WTO. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985). Finally, I agree with the majority that Skove has alleged a violation of his Fourth Amendment rights and defendant Smith is not entitled to qualified immunity.

\* \* \* \*

Because Order No. 3 was not narrowly tailored, did not leave open ample alternative means of communication, and afforded individual officers unbridled discretion in its enforcement, it is facially unconstitutional. I would therefore reverse the district court's grant of summary judgment against all *Hankin* plaintiffs, *cf. slip op.* at 6008 n.67, and against Menotti, Sellman and Skove on their First Amendment claims. I would also reverse the district court's summary judgment against Menotti, Stedl, and Skove as to their Fourth Amendment claims.